## UNITED STATES *v.* SHELBY IRON COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE
FIFTH CIRCUIT.

No. 123. Argued January 13, 1927.—Decided April 11, 1927.

1. A contract by which land on which improvements have been erected with money advanced by one party to the other is to be deeded to the lender absolutely, and the borrower, as his lessee, in consideration of " rentals " amounting to the aggregate debt, is to have possession and, upon full payment, is to receive a reconveyance of the land and improvements, but, in case of default, may have his rights forfeited by re-entry of the lender, is an equitable mortgage for security of the money unpaid. P. 578.

2. In such case, where the lender, having taken over the premises on the borrower's default, finds that the deed he received is defective, his proper remedy is not to reform it, but to seek a sale under the mortgage, and distribution of the proceeds to those entitled. P. 578.

3. A contract made by the United States for erection and operation of an acetic acid and wood alcohol plant on land to be deeded to it recited that the wood required in the operation of the plant would be obtained by the other party under another contract between that party and a stranger to the first mentioned contract. *Held* that this did not constructively notify the United States of the stranger's rights in the land, as revealed by the contract so referred to, since the matter mentioned in the recital was not such as to arouse any inquiry concerning that title. P. 580.

4. Where a land-owner, as part of a contract, agrees to convey land to the other party for use in performance of the contract, but to be reconveyed thereafter free and clear of liens, and the contract permits the grantee to mortgage and relies only on his responsibility to clear the title before reconveyance, an equitable mortgage made by the grantee in pursuance of the purposes for which the contract was made, and remaining unpaid because of his insolvency, takes priority over the equity of the grantor in the land. So *held* where the attempted conveyance of the land was inoperative because of a mistake, so that the legal title remained in the grantor. P. 581.

4 F. (2d) 829, reversed.

APPEAL from a decree of the Circuit Court of Appeals which affirmed a decree of the District Court adverse to

the United States in a suit in which it sought to quiet
title to a piece of land in Alabama as against the cor-
poration above named, of New Jersey, and another called
the Shelby Iron Company of Alabama. The decree denied
the relief and declared the title and right of possession,
as between the plaintiff and the Shelby Iron Company
of New Jersey, to be in the latter; but it gave the plain-
tiff six months in which to remove from the land buildings
and equipment constituting a plant erected thereon by
the Shelby Chemical Company, under a contract with
the plaintiff.

*Mr. Gardner P. Lloyd,* Special Assistant to the Attor-
ney General, with whom *Solicitor General Mitchell,* and
*Messrs. James E. Morrisette* and *Randolph S. Collins,* At-
torneys in the Department of Justice, were on the brief,
for the United States.

*Mr. Edward H. Cabaniss* for appellees.

MR. CHIEF JUSTICE TAFT delivered the opinion of the
Court.

This is a controversy over priority of equities in fifteen
acres of land in Alabama, with a wood distillation plant
thereon, between the United States and the Shelby Iron
Company of New Jersey. The case involves the construc-
tion of a contract between the United States and the
Shelby Chemical Company, on the one hand, and of a
contract between the latter and the Shelby Iron Com-
pany of New Jersey, on the other. The first was for the
construction and operation of the plant on the land to be
conveyed by the Chemical Company to the Government,
with money to be furnished by the latter, for the produc-
tion of acetate of lime and methyl alcohol for use in the
War. The second was entered into between the Chemical
Company and the Shelby Iron Company of New Jersey
in anticipation of the first. The Iron Company agreed to

convey to the Chemical Company the needed land, which was near the works of the Iron Company, and to furnish hard wood, water, workmen's houses and power necessary in the operation of the plant. The benefit which the Iron Company was to derive from the arrangement was the cheapness of cost of the charcoal to be made by the Chemical Company as a by-product of the process of distillation, and to be sold at a fixed price to the Iron Company, for use in its blast furnaces situated in a large tract of timber land, of which the Iron Company was the owner, and of which the fifteen acres here in question was a part.

The Chemical Company executed a warranty deed of the fifteen acres, to the Government, in intended compliance with its contract; but the Iron Company had failed to convey the land to the Chemical Company as agreed by it. A deed was actually executed to the Chemical Company by an Alabama Company of the same name, instead of the New Jersey Company that owned the land. The Alabama Company, a former owner of the land, was then an inactive company, the stock of which was owned by the New Jersey Company, and the directors in the two companies were the same. So the Government's legal title failed for misdescription of the grantor.

This suit was a bill in equity to quiet title in the United States against the two companies, the Alabama Company and the New Jersey Company. The New Jersey Company, relying on the misdescription, answered and denied the title of the United States. Thereupon, the Government amended its bill and asked that the deed be reformed. Then the New Jersey Company, which we shall hereafter call the Iron Company, answered by a recital of facts which, it claimed, showed that it had an equity in the fifteen acres of land stronger in right than that of the United States. This constitutes the issue in this case, for the mistake and misdescription are admitted and the

right of the United States to reformation of the deed is conceded, but for this claim.

The contract between the Iron Company and the Chemical Company was made April 8, 1918, and provided that the Iron Company should by warranty deed, free of all liens and encumbrances, for a nominal consideration, provide sufficient ground on which to build the plant of the Chemical Company. In a subsequent clause, it says: "Inasmuch as the United States Government will be financially interested in the construction of the Chemical Company's plant, it is expressly agreed that said real estate may be deeded to and vested in the United States Government during the period of a contract made between the Chemical Company and the United States Government, said contract to extend for the duration of the war." And further: "It is understood that the Chemical Company is about to construct its plant under a contract with the United States Government, by the terms of which the Chemical Company is to become the owner of the land, buildings, equipment and improvements, if an enabling statute to that effect shall be passed by the Congress of the United States. Therefore, it is distinctly agreed that the foregoing provision as to reconveyance of the lands is subject to the obtaining of the title to said lands by the Chemical Company from the United States Government."

By the eighth paragraph, it was provided that the contract should last until April 1, 1933, with the right of the Iron Company to extend it further for five years upon notice to the Chemical Company; and that at the end of the contract, or its renewal, the Chemical Company should reconvey to the Iron Company all of the lands conveyed to it by the Iron Company, without cost to it, free and clear of any encumbrances or liens whatsoever, or, if there were any mortgages on the same not yet due, the Chemical Company should pay over to the Iron Company the amount thereof, or the amount of any bonds outstand-

ing thereunder, with any accrued interest thereon, and should, if the Iron Company so elected, sell to it all the improvements, equipment and other personal property placed on the lands by the Chemical Company.

Thereafter, on April 23, 1918, the government contract with the Chemical Company was made. It was estimated that the plant would cost over $400,000, which the United States agreed to advance and reimburse itself by deductions from payments to be made from the sale by the Chemical Company to the Government of the acetate of lime and the methyl alcohol.

Among the preliminary recitals in the contract is this:

" Whereas the contractor has a contract with the Shelby Iron Company of Shelby County, Alabama, according to the terms of which the Shelby Chemical Company shall receive all the lumber it may require from timber land owned and leased by the Shelby Iron Company in return for all charcoal derived therefrom."

This recital becomes important on the question of notice hereafter to be considered.

The government contract, in its first article, provided that the Chemical Company, the contractor, was to convey to the United States a tract of land at Shelby, Alabama, of adequate size and suitable location, for the erection of the plant thereafter described. The conveyance was to be made subject to and upon the completion of an opinion by the Attorney General that, by the conveyance, the Government would derive an absolute title to the premises in fee simple, free and clear of all encumbrances, and that the United States should have the right to expend money for the erection of improvements thereon.

By article II the contractor agreed to erect and construct for the Government, on the land, a properly equipped wood chemical plant with a certain capacity, to be completed in five months, to be paid for by the Govern-

ment at cost, the particulars of construction to be embodied in a separate contract.

The third article provided for the retention of 40 per cent. of the price of all sales to the Government of the products of the manufacture, to yield 6 per cent. interest on the government investment in the plant and to constitute a depreciation and amortization fund for the benefit of the Government.

By the fourth article the contractor agreed to sell and deliver to the Government the entire output of acetate of lime and methyl alcohol, and the Government agreed to buy it, during a period of 18 months and then for the duration of the War, at certain agreed prices and on certain conditions.

By the sixth article it was provided that, when the depreciation and amortization fund and the purchase fund provided should together equal the cost to the Government, with interest at 6 per cent., of the Government's investment, or at any earlier date at the option of the contractor, the Government should sell to the contractor, and the contractor should purchase the plant, machinery and equipment, at the then fair market value, to be fixed by appraisement. The obligation of the Government to sell the plant was conditioned upon its having legal authority to make such sale and conveyance.

Article VII provided that the Government might take possession of the plant and operate it, on failure of the contractor to comply with the terms of the contract, but its right to operate should cease and terminate at the end of the War. If at that time the sale of the plant to the contractor should have been consummated, the Government was to surrender possession to the contractor, and if the plant was then still owned by the Government, it should at its own expense, within six months from the end of the War, remove all buildings and equipment, constituting such plant, from the ground upon which the same

were erected, and should without further consideration reconvey such ground to the contractor.

Article XVII provided that, in the event of an armistice, the Government at its option might terminate the agreement; but in such event the contractor should receive from the Government the unpaid purchase price of the product then actually manufactured, and the contractor should receive further from the Government a sum sufficient to protect it against its actual net expenditures and actual net outstanding obligations incurred in the manufacture. Then the value of the plant, machinery and equipment should be determined by appraisal, as already provided, and the Government should sell and the contractor should purchase the plant and equipment at the appraised value; and, in making the settlement, the contractor should be given credit on account of the purchase price for the 35 per cent. of the purchase price of the products theretofore sold to the Government and by it retained for security.

After the plant had been partially constructed, and $260,000 was still owing to the Government from the Chemical Company, a new contract was made between them, dated January 25, 1919, whereby the Government should become the absolute owner of the property free of all claims, and the Government should lease the property to the contractor for three years, the contractor to pay to the Government $50,000 down on account of the rental, and in one year $50,000 more, and in two years $75,000, and in three years $85,000, all of which was to apply as rental for the property. The company was to pay all the taxes. It was further provided that the contractor should complete the plant and, at the expiration of the three years, the Government, for the consideration of one dollar, would convey the whole property to the contractor; or should the contractor, not being then in default for

42847°—27——37

any unpaid payments required to be paid by it under the terms of the contract, desire at any time to purchase the property, the Government would sell it for a sum equal to the difference between $260,000 and the total sum of rents then paid. It was agreed in the contract that, should the contractor at any time default in any of the payments required to be made to the Government in the lease, the Government might waive such default, or treat and regard the lease and obligation and privilege to purchase as forfeited, or treat and regard the lease as a continuing legal and binding obligation, but the obligation and privilege to purchase was to be forfeited.

The president of the Iron Company denies that it had knowledge of this second contract. The plant was completed under the second contract, and charcoal was made and delivered to the Iron Company till 1922 in March. The Government took over the plant in December, 1922, and the Chemical Company became a bankrupt in 1923.

It is clear that the effect of the purported contract of lease of January, 1919, was that of an equitable mortgage. The rentals to be paid were the installments of the amount due under the original contract from the Chemical Company for the amount of money which the Government had advanced, less that which it had already received, and upon payment of the rental stipulated, the title was to revert to the Chemical Company, while the Government reserved the power to take over the property in case of default or bankruptcy of the Chemical Company. Its default gave to the Government the right to enforce against the land and the plant the debt due under this equitable mortgage. *Peugh* v. *Davis,* 96 U. S. 332, 336; *Robinson* v. *Farrelly,* 16 Ala. 472; *Lowery* v. *Peterson,* 75 Ala. 109, 111; *Moses* v. *Johnson,* 88 Ala. 517, 520; *Love* v. *Butler,* 129 Ala. 531, 537, 538.

The remedy which we think the Government is entitled to, unless it is to be defeated for the reasons about to be

examined, is not the reforming of a deed and a decree compelling the Shelby Iron Company of New Jersey to substitute its own deed to the Chemical Company for the useless and void deed of the Shelby Iron Company of Alabama. It is rather to give to the Government leave to reframe its pleadings so as to set up therein its ownership of an equitable mortgage upon the land and the plant, to be enforced by a sale thereof and the proper distribution of the proceeds. Of course, we might affirm the action of the Circuit Court of Appeals, with a provision in the affirmance that it should be without prejudice to the beginning of an original suit by a new bill in equity setting forth the equitable mortgage as against the Iron Company, and asking its enforcement, and, if need be, its foreclosure against the land and the plant. We think, however, that it is wiser, and better, and shorter, to end the litigation in this one proceeding.

The Iron Company objects to this action by the Court, on the ground that it has conflicting equitable rights that should defeat any recovery under the alleged mortgage. It insists that under the original contract, as construed in the light of its contract with the Chemical Company, the title of the Government to the land and plant, even if it had been perfected as a legal title, was to terminate at the end of the War, and that the Iron Company was entitled as against the Chemical Company and the Government to the reconveyance of the land. It further insists, that the Government knew of this limitation upon its right to retain the ownership of the property as shown in the contract between the Iron Company and the Chemical Company, and that its only security was in the power reserved to it by the original contract between it and the Chemical Company to remove from the land the plant, within six months, and this it has not exercised and refuses to do so. It shows, that it expended $50,000 in preparing for the

changes due to the installation of the plant by the Government, and has suffered loss by failure of the Chemical Company to comply with its contract. It further says, that the fifteen acres of land is so related to the larger tract of which it was a part that its use and control are essential to the Iron Company's operation of its blast furnace, and that it offered to pay the balance of $210,000 for the transfer to it of the Government's whole interest in the land and plant. It urges that as between it and the Chemical Company, it became entitled to a reconveyance and to take possession of the land because of the breach and bankruptcy of the Chemical Company as a termination of the contract, as if it had expired by limitation. This presents an issue as to the notice which the Government had of the Iron Company's claim under its contract.

The argument of the Iron Company is, that the recital in the Government's contract that the Chemical Company would receive, under a contract with the Iron Company, all the lumber it might require from timber lands of the Iron Company in return for all charcoal derived therefrom, put the United States on notice of everything contained in the contract between the Chemical Company and the Iron Company in respect of the title to the land and the future plant. It relies on the principle that the law imputes knowledge when opportunity and interest, coupled with reasonable care, would necessarily impart it, and that, where one paper refers to another paper within the power of the party, it gives notice of the contents of the other paper to that party. We have no quarrel with this rule as to constructive notice, but we do not think that it applies here. The reference in the first paper, to require examination of the second, must be one that indicates that both are dealing with a subject matter to which inquiry would be relevant. Here the relevant object of the inquiry would have been the title

to the land and the plant upon it.  The recital does
not refer either to the land or the title to it, but to the
furnishing of wood by the Iron Company.  To charge
one with notice, the facts must be such as ordinarily
to excite inquiry as to the particular fact to be elicited.
*Rogers* v. *Rawlings*, 298 Fed. 683; *Mueller* v. *Engeln*,
75 Ky. 441; *Hyde Park Supply Company* v. *Peck-Wil-
liamson Heating Company*, 176 Ky. 513; 2 Pomeroy's
Eq., § 629, pp. 1208, 1209.

We think, therefore, that the question of notice must
be reëxamined, and that the issue must be not of implied
notice but of actual notice.  It was contended that one
of the officers acting for the Government was in such a
position that he probably knew what the contents and
the effect of the contract between the Iron Company and
the Chemical Company were in reference to the tenure
of the Government in the land, and that the fact that
he was not called to testify on the subject was a circum-
stance tending to sustain the claim that the Government
had actual notice.  The Iron Company will have the
opportunity to present this and other evidence to the
trial court, upon the issue of such actual notice, when
the pleadings are reframed.

Counsel for the Government make a further argument
to show that, even if the Government had had notice
of the contents of the contract between the Iron Company
and the Chemical Company, its purpose and effect could
not in any way impair the effect of the equitable mort-
gage the Government acquired under its second contract
and so-called lease to the Chemical Company.  They say
that the Iron Company, in its contract with the Chemical
Company, and in the 8th paragraph thereof, manifested
clearly an expectation and consent that the Chemical
Company might encumber the land and the plant with
liens or mortgages, and relied only on the credit and

obligation of the Chemical Company, in reconveying to the Iron Company, to clear off mortgage liens or bonds which the Iron Company evidently thought the Chemical Company might create. If this is the correct view, an equitable mortgage of the Government of the land and the plant, in which it had an interest to the extent of $260,000, must be clearly superior to the equity of the Iron Company growing out of the obligation of the Chemical Company to reconvey the land to the Iron Company. Neither the District Court nor the Circuit Court of Appeals considered this phase of the case. It may not have been presented to them. Their consideration was chiefly given to the issue of misdescription, and to the meaning of the clauses providing for reconveyance of the land and improvements by the Government, in the contract between the Government and the Chemical Company. We do not now consider and pass upon the contention of the Government in these regards. We refer to it to have it clearly understood that, when cause goes back, nothing in what we have said shall prevent a showing of actual notice to the Government of the claim of the equity of the Iron Company in the land, by virtue of its contract with the Chemical Company on the one hand, or the construction of the 8th paragraph of that contract, as a reason for maintaining the priority of the Government's equitable mortgage, whether it had notice of the Iron Company's contract or not, on the other.

The decree of the Circuit Court of Appeals will therefore be reversed and the cause remanded to the District Court for a reframing of the pleadings and for further proceedings not inconsistent with this opinion.

*Reversed.*