CHICAGO BRIDGE & IRON COMPANY,
a corporation, Appellant,

v.

HARTFORD FIRE INSURANCE
COMPANY, a corporation, et al.

No. 77–1227.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 16, 1978.
Decided Dec. 21, 1978.

Ross O'Donoghue, Washington, D. C., for appellant.

John P. Arness, Washington, D. C., with whom Gail Starling Marshall, Washington, D. C., was on the brief, for appellee, Hartford Fire Ins. Co.

Samuel Becker, Washington, D. C., was on the brief, for appellee, Thomas G. Corcoran.

Also, Frank H. Strickler, Washington, D. C., entered an appearance for appellees, Hodges and Lee.

Before WRIGHT, Chief Judge, and MacKINNON and WILKEY, Circuit Judges.

Opinion for the court filed by MacKINNON, Circuit Judge.

MacKINNON, Circuit Judge:

On December 21, 1972, Chicago Bridge and Iron Co. (hereafter "CBI") entered into a stock purchase agreement with two of the major shareholders (hereafter "Sellers")[1] in Fairmac Corporation.[2] The assets of Fairmac included an apartment complex in Washington, D. C. called "McLean Gardens." The purchase price paid by CBI for the outstanding Fairmac stock owned by the Sellers, either individually or in a trusteeship capacity, was $16,500,000.[3] In this action, CBI claims breach of warranty damages in the amount of $157,000.

On June 29, 1973, about six months after the execution of the stock purchase agreement, a suit was filed against CBI Fairmac, the successor corporation to Fairmac, for damages arising out of the tragic rape and murder on September 10, 1972 of Rebecca Rieser, a tenant of the McLean Gardens complex owned at that time by Fairmac.[4] The complaint alleged that Miss Rieser had been murdered by a Fairmac employee; it sought punitive and compensatory damages for negligent hiring and retention of the employee. The litigation was settled in 1975 by a total payment to the Rieser estate of $650,000 by CBI Fairmac. CBI Fairmac possessed a liability insurance policy issued by New Hampshire Indemnity Co. (hereafter "New Hampshire") with individual limits of $1 million. This policy had been outstanding when the murder was committed, but CBI Fairmac and New Hampshire

contended that the policy did not cover punitive damages. Under the final settlement arrangement, the insurer paid $400,000, and CBI Fairmac paid $250,000 and *released New Hampshire from any further liability on its policy* (J.A. 46). On December 30, 1975, CBI, the majority shareholder in CBI Fairmac, filed suit against the Sellers seeking recovery of the damages it allegedly suffered as a result of CBI Fairmac's payment of punitive damages toward settlement of the Rieser litigation. The stock sales agreement provided that Sellers would not be liable for misrepresentation or breach of warranty unless the losses exceeded $100,000.[5] Of the $157,000 claimed in this action, which is the amount by which CBI Fairmac's payment exceeded the contractually agreed $100,000 floor, $150,000 represent monies paid by CBI Fairmac in settlement of the Rieser suit, and the remaining $7,000 represent a claim for architectural services.[6] After full and extensive discovery, the defendant Sellers filed motions for summary judgment, which were granted by the district court on January 31, 1977.

The contract between CBI and the stockholders for the sale of stock contained the following provision:

> 3.6 *Disclosure.* Neither this Agreement nor any certificate or other document furnished to the Purchaser hereunder or in connection with the transactions

---

1. The shareholding Sellers were Hartford Fire Insurance Company (hereafter "Hartford") and Thomas G. Corcoran (hereafter "Corcoran"), who held some stock individually and some as trustee.

2. The Agreement is set forth in the Joint Appendix at 9–30.

3. Of the 100 outstanding shares in Fairmac, Hartford owned 69. Twenty-three other shares were either owned individually or held as trustee for other individuals by Corcoran. The remaining eight shares were owned by Walter Hodges and J. L. Lee, managers of Fairmac. On December 21, 1972, Hodges and Lee executed a stock exchange agreement with CBI whereby Hodges and Lee received shares in the new corporation, CBI Fairmac, in exchange for their shares in Fairmac (J.A. 3, 31, 35, 86–117). Hodges and Lee were initially named as third-party defendants, but Hartford's and Corcor-

an's third-party complaints were dismissed in the district court's January 31, 1977 order (J.A. 145).

4. The facts of this tragic and brutal crime are set forth in our opinion in *Rieser v. District of Columbia,* 183 U.S.App.D.C. 375, 377–381, 563 F.2d 462, 464–68 (1977), *vacated* (Nov. 7, 1977), *reinstated in part and amended in part en banc,* 188 U.S.App.D.C. 384, 580 F.2d 647 (1978).

5. Stock Purchase Agreement of Dec. 21, 1972, § 9, J.A. 25.

6. Since the warranty agreement provides for indemnity for losses in excess of $100,000, the parties agree that a ruling with respect to the $7000 claim is necessary only if the larger claim is found to be valid.

contemplated hereby contains to the knowledge of any of the Sellers any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not misleading. There is no fact to the knowledge of the Sellers not disclosed. in this Agreement which materially adversely affects' or in the future may (so far as the Sellers can now foresee) materially adversely affect the condition (financial or other), business or prospects of the Corporation.

Stock Purchase Agreement of December 21, 1972, at J.A. 15–16. Also, the Sellers gave the following warranty in an accompanying letter:

> We further represent and warrant that nothing has been brought to our attention nor do we know of any fact or condition which would lead us to believe that any of the representations and warranties set forth in Exhibit A attached hereto,[7] which Hodges and Lee have made to you, are not true and correct.

Letter of December 21, 1972, at J.A. 30. Thus, the Sellers warranted that the Agreement and other documents furnished to CBI did not omit any material fact necessary to make any statements contained in the Agreement not misleading, and that there was no fact within their knowledge that either was affecting or could foreseeably affect the corporation in a materially adverse way. This warranty clearly did *not* cover all contingent liabilities. The promise of indemnification extended only to undisclosed material information within the Sellers' knowledge. This warranty was not absolute or strict, and is thus distinct from those which impose liability on the warrantor irrespective of his knowledge.[8]

The question then is whether the Sellers disclosed all material facts within their knowledge in the manner required by the warranty. The record shows that the Rieser murder had been disclosed orally to representatives of CBI prior to the sale, and that all the information within the knowledge of the Sellers was communicated to CBI (J.A. 189–94, 210, 241–45). There is no material dispute about the nature of these disclosures. Richard Barton, Vice-President and General Counsel of CBI, testified that he attended a meeting in Fairmac offices on September 20, 1972, ten days after the murder (J.A. 190–91, 217, 241).[9] Barton testified that Walter Hodges, General Manager of Fairmac, told him that a rape and murder had occurred, and that a Fairmac employee was being held as a suspect (J.A. 241–42). Barton's recollection was that he examined either a copy of the insurance policy or a binder that showed the existence of $1 million of insurance, and that he satisfied himself that the insurance would cover

---

**7.** In the joint appendix filed with this court, there is no "Exhibit A" attached to the December 21, 1972 letter, which appears at J.A. 29–.30. It may be that no exhibit was ever attached to the letter. Hartford's answers to CBI's interrogatories include a statement that Hartford has no copy of an attachment and the *signor does not recall* any document being attached at the time of signing. Hartford believes Exhibit A was intended to refer to the "Organizing and Stock Exchange Agreement" entered between Hodges and Lee, and CBI (J.A. 54–55). The Organizing Agreement is reproduced at J.A. 86–108. The warranties given by Hodges and Lee differ from those given by the Sellers (*see* J.A. 94–95). Regardless of what Hodges and Lee warranted, the warranty being sued upon here runs from the Sellers to CBI, and *that warranty* states "nothing has been brought to *our attention* nor do *we know* of any fact or condition which would lead *us* to believe that any of the representations and warranties . . . which Hodges and Lee have made to you, are not true and correct." (J.A. 30, *emphasis added*). CBI must show knowledge on the part of the Sellers to recover under this warranty and that it has not done.

**8.** *E. g., Blustein v. Eugene Sobel Co.*, 105 U.S. App.D.C. 32, 263 F.2d 478 (1959). We note that the principal reasons which lend weight toward the imposition of strict liability in other contexts, such as products liability, are absent here where the parties bargained for and negotiated the terms of the contract (J.A. 224–33), where the parties did not possess unequal power, *and where the parties had equal knowledge* and access to the facts and circumstances underlying the transaction.

**9.** CBI was also represented at this meeting by George Lundin, Tax Manager and Assistant Treasurer. Fairmac was represented by Walter Hodges and J. D. Lee, Managers of Fairmac. J.A. 43.

whatever liabilities developed (J.A. 242–43). Hodges' testimony closely paralleled Barton's (J.A. 189–94); Hodges testified that he told Barton "everything we knew about it" (J.A. 190–91, 194). CBI stated in response to one of Hartford's interrogatories that it had "no information that Hodges and Lee [another manager of Fairmac also present at the September 20 meeting] knew any details other than those disclosed to CBI on September 20, 1972" (J.A. 51). Barton also testified that he was not aware of any evidence that Hartford, one of the Sellers, knew more than he was told by Hodges in the September 20 meeting (J.A. 244–45) and that neither he nor anyone else at CBI had "certain knowledge" of the omission of any material information necessary to make the statements in the Agreement not misleading (J.A. 237). Hartford stated in interrogatories that it knew no more than Hodges knew, and that this information was relayed to CBI (J.A. 55). The Rieser suit was filed over six months after the sale of the stock. At the time of the sale, no lawsuit had been filed, and no claim had been asserted, on account of the murder (J.A. 192–93).

■ The basis of CBI's complaint is that the Agreement required that all claims be written down in the Agreement or some other document furnished to the Purchaser, and that the failure to list the murder of Miss Rieser is a breach of warranty.[10] Thus, CBI insists that the Agreement and written documents omitted "a material fact necessary in order to make the statements contained herein or therein not misleading" (Agreement, § 3.6). We conclude, however, that the failure to write down the information concerning the murder did not render any statements or representations made by the Sellers misleading. At the time of the sale, there was no present or foreseeable impairment of the corporation's business or prospects known to the Sellers, and hence, the representations made in the Agreement were not misleading. The failure to make a written disclosure did not "materially adversely affect[ ]" nor could the Sellers foresee that the information they (and the purchasers) had might "in the future . . . materially adversely affect" the condition of the corporation. The record shows that CBI representatives were satisfied and reasonably believed that the insurance policy Fairmac then had with New Hampshire was adequate to cover whatever liability might develop. CBI, although on notice of the rape and murder and its circumstances to the extent known by defendants, apparently did not believe the incident justified a more detailed immediate investigation, as CBI did not seek out any information beyond that which it obtained from Hodges and Lee. It is unreasonable to suggest the Sellers could foresee at the date of the sale, based on the information they had, that a claim would be filed which would not be covered by insurance and which would therefore require a payment in settlement by the owner of McLean Gardens.

■ CBI is left only with the argument [11] that defendants *should have known* facts which would have put defendants on notice that a potentially large judgment against it was possible, a judgment that insurance would not cover. In other words, CBI contends that knowledge of material facts was available to the Sellers, that the additional knowledge could have been gained from further investigation, and that this knowledge is therefore imputable to the Sellers. It is frequently said that "the

---

**10.** There is no basis for concluding that defendants did not disclose the fact of the rape and murder and of what was then known about the suspected involvement of the Fairmac employee. We have discussed this point *supra*, and we agree with the findings of the district court in this particular. We do not understand CBI to argue that the warranty was breached because disclosure was not made; instead, we understand CBI to argue that the breach occurred because the facts which would support the Rieser estate's claim or the claim itself were not set forth in the Agreement, any attachment thereto, or any other document given to the purchasers. Appellant's Br. at 8; Appellant's Reply Br. at 2.

**11.** CBI has raised other points in its brief and in oral argument and we have carefully considered them, but we dismiss them as insubstantial.

law imputes knowledge, when opportunity and interest, [combined] with reasonable care, would necessarily impart it." *United States v. Shelby Iron Co.,* 273 U.S. 571, 580, 47 S.Ct. 515, 519, 71 L.Ed. 781 (1927); *Booth Fisheries Corp. v. Coe,* 72 U.S.App.D.C. 195, 196 n. 3, 114 F.2d 462, 463 n. 3, *cert. denied,* 311 U.S. 691, 61 S.Ct. 72, 85 L.Ed. 447 (1940). We do not believe that the Sellers here failed to exercise reasonable care. Generally, shareholders have no duty to inquire into the operation of the corporation's business and are not chargeable with knowledge of the dealings and other transactions of the corporation. *Nettles v. Childs,* 100 F.2d 952, 957 (4th Cir. 1939). Sellers, from their relationship to the operation of Fairmac, knew the essential elements of the incident, and those details were transmitted to the purchasers; the failure to commit those details to writing did not breach the warranty, as we have explained above. Given the reasonable belief that the insurance would cover whatever liability might arise, there was no requirement for further investigation, even though hindsight would arrive at a different conclusion.

It is safe to say that all parties, based on the knowledge they possessed, had equal reason to suspect that a lawsuit might be brought, but none believed, or had any reason to believe, that the $1 million liability insurance policy would not cover any judgment that might be rendered. All the liability here, for which recovery is sought from the Sellers, resulted from the claim for punitive damages against CBI Fairmac which was satisfied by the payments by CBI Fairmac and New Hampshire of $650,-000 *in settlement* of their liability in the litigation, as which time CBI Fairmac released New Hampshire from any obligation beyond the $400,000 paid by it. If any of the parties early on thought of the possibility of punitive damages, there is nothing to indicate that they did not consider it to have been covered by the outstanding insurance policy. And all the parties were on

notice of the basic facts of the murder and had any one of them investigated they would have discovered the factual basis from which the claim for punitive damages eventually emerged.[12]

■ It is the role of this court upon an appeal from an order granting summary judgment to determine whether the substantive law was correctly applied. *North Central Airlines v. Continental Oil Co.,* 187 U.S.App.D.C. 371, 375–376, 574 F.2d 582, 586–87 (1978); *Bloomgarden v. Coyer,* 156 U.S.App.D.C. 109, 114, 479 F.2d 201, 206 (1973). Our review of the extensive record and consideration of the proceedings in the district court reveal no genuine disputed issues of material fact. Further, we perceive *no error in the* manner in which the district court interpreted the warranty and applied the substantive law. Hence, the entry of summary judgment for appellees is affirmed.

*Judgment accordingly.*

---

**12.** It is not without significance that the Rieser Estate and the District of Columbia also initially failed to realize the full involvement of all the parties. *Rieser v. District of Columbia, supra,* 183 U.S.App.D.C. at 381, 388–390, 563 F.2d at 468, 475–77.