**STATE ex rel. T.A.B., Relator,**

v.

**Honorable William M. CORRIGAN, Judge of the Juvenile Court of St. Louis County, Clayton, Missouri, Division No. 7.**

**No. 41959.**

Missouri Court of Appeals,
Eastern District,
Division Four.

April 8, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 19, 1980.

Application to Transfer Denied
July 15, 1980.

John G. Young, Jr., Ziercher, Hocker, Tzinberg, Human & Michenfelder, Clayton, for relator.

William R. Seely, Corinne L. Richardson, Clayton, for respondent.

SIMON, Justice.

Relator instituted this original writ proceeding to prohibit respondent from adjudging relator guilty of direct contempt for her refusal to identify the putative father of her illegitimate child at a hearing to terminate her parental rights. This court entered its preliminary writ of prohibition, which is hereby made absolute.

Relator is an unmarried young woman who gave birth to Baby Girl B. in St. Louis County, Missouri, although she resides outside of that county. Shortly after the birth and in order to permit the adoption of Baby Girl B., relator executed a consent to termination of her parental rights and the Juvenile Officer of the Juvenile Division of the Circuit Court filed a petition to terminate parental rights in accordance with the provisions of Sec. 211.447 and Sec. 453.030.3, RSMo.1978.[1] Catholic Charities of St. Louis filed a consent to accept transfer of legal custody and, in fact, currently has actual custody of the infant.

1. All further references shall be the Revised Statutes of Missouri 1978 unless otherwise noted.

At a hearing on the petition to terminate parental rights, respondent asked relator whether or not she knew the identity of the infant's father. She answered affirmatively. Respondent inquired if relator knew or could discover the address of the putative father and, again, she replied affirmatively. But, when respondent asked relator to state the name of the punitive father, she refused. Respondent then entered an order finding relator in contempt and ordered her to be incarcerated until she divulged the identity of the putative father to respondent, said order to take effect on August 10, 1979 or, if prior to that date relator filed a petition for a writ, to take effect upon the resolution of the writ proceeding. Relator's petition for a writ of prohibition was timely filed and the effect of respondent's order was stayed. In addition, a ruling on the petition to terminate parental rights was held in abeyance so that Baby Girl B. remains in foster care.

Relator contends that respondent is exceeding his jurisdiction by finding relator in contempt because respondent has misconstrued Sec. 211.442 and Sec. 211.457 as requiring notice to the putative father. She also submits that respondent's attempt to force her to identify the putative father violates her right to privacy and her "testimonial privilege not to degrade or humiliate herself." Relator also claims that respondent's action violates the constitutional rights of her infant child.

The record here includes a transcript of the hearing at which respondent found relator guilty of contempt. There, respondent stated that the statutes and case law of Missouri required him to order relator to identify the putative father so that the putative father could be given notice of the action to terminate parental rights. Respondent also indicated his belief that the parental rights of the putative father must be terminated before the infant could be adopted. Respondent relied on Secs. 211.-442, 211.457 [2] and 211.477 [3] to require notice to the putative father.

Section 211.442 provides as follows:

"As used in sections 211.442 to 211.492 'parent' means a biological parent or parents of a child, as well as the husband of a natural mother at the time the child was conceived, or a parent or parents of child by adoption, and includes both the mother and putative father of an illegitimate child. The father of an illegitimate child shall have no legal relationship unless he, prior to the entry of a decree under sections 211.442 to 211.492 has acknowledged the child as his own by affirmatively asserting his paternity; provided, however, that a parent whose identity is known and who can be personally

2. Section 211.457. Hearing required—parties to be summoned—waiver.

1. Termination of parental rights shall be made only after a hearing before the juvenile court. A summons may be issued by the judge or clerk of the court requiring the person, agency or organization having custody or control of the child to appear with the child at the place and time stated in the summons. Persons who shall be summoned and receive a copy of the petition shall include the parent of the child, the guardian of the person of the child and the person, agency or organization having custody of the child. A summons shall be issued requiring the appearance of any other person whose presence the court deems necessary.

2. Service of summons shall be made as in other civil cases in the manner prescribed in section 506.150, RSMo. However, if service cannot be made as prescribed in section 506.-150, RSMo, and it is not waived, then the service shall be made by mail or publication as provided in section 506.160, RSMo.

3. Any person required to receive summons may waive appearance or service of summons.

3. Section 211.477. Order of Termination—powers of court.

1. If after hearing the court finds that one or more of the conditions set out in section 211.-447 exist and the termination of the parental rights of the parent in and to the child is in the best interests of the child, it may terminate all rights of the parent with reference to the child.

2. If the court terminates the parental rights of all parents of the child, it may transfer legal custody of the child to a suitable person, the state division of family services or a licensed or an approved child welfare agency.

3. If only one parent consents or if the conditions specified in section 211.447 are found to exist as to only one parent, the rights of only that parent with reference to the child may be terminated and the rights of the other parent shall not be affected.

served shall be served by process as provided in chapter 506, RSMo. of this state and made a party to any action under sections 211.442 to 211.492."

The crucial question presented herein is the interpretation of Section 211.442. The prior laws pertaining to termination of parental rights were significantly different from the current law. There was no definition of "parent." Section 211.461, RSMo.1969 (Now Sec. 211.457) stated that "Persons who shall be summoned and receive a copy of the petition shall also include the parents of the child, *the surviving parent if one of the child's parents is dead*, or its guardian, and the *state division of welfare*, agency or organization or person *standing in 'loco parentis' having an interest in the welfare of the child.*" (Emphasis added.) Section 211.501.2, RSMo.1969 (Now Sec. 211.477) provided that the court could transfer custody of a child upon termination ·of the parental rights of both parents, *of the mother if* the child was illegitimate, or of the only living parent.[4]

The change in Missouri law relating to termination of parental rights occurred at a time when legislators, writers and the courts were becoming increasingly aware of the emerging status of the putative father. The revision of Missouri statutes regarding termination of parental rights can be traced to developments in the law, beginning with *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), which dealt with the rights of a putative father. In *Stanley*, an Illinois statute automatically declared illegitimate children wards of the state upon the death of their mother. The putative father was not given an opportunity to prove his fitness as a parent to the children because the statute declared him unfit as a matter of law.[5] Petitioner Peter Stanley had lived with the deceased mother intermittently for 18 years, and during that time they had three children. He acknowledged the children, lived with them as a family, supported them, cared for them and raised them. The Supreme Court found that the Illinois statutory scheme violated the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution, and that Stanley was entitled to a hearing on his fitness before his children were declared wards of the state.

Subsequent to the *Stanley* decision the Missouri Supreme court considered the rights of a putative father who was denied an opportunity to protect his status as a parent by operation of the laws of termination of parental rights. *State ex rel. J.D.S. v. Edwards*, 574 S.W.2d 405 (Mo. banc 1978).[6] The putative father in *Edwards* had continually demanded custody of his child and had regularly visited the child, who was in foster care. The mother had consented to the termination of her parental rights and executed a waiver of the necessity of consent to her son's future adoption. The juvenile officer filed a petition to terminate all parental rights of the mother and to transfer legal custody. Before the hearing the putative father was notified. He contended that his parental rights would be terminated without due process and in violation of the equal protection clause of the United States Constitution and the court agreed, citing *Stanley v. Illinois, supra*. The court found that this putative father, "having manifested a strong interest in the control and custody of his children," was entitled to the protections afforded the putative father in *Stanley*,

---

4. These sections remained unchanged from the Revised Statutes of Missouri, 1959, until the enactment of H.B.No. 972 in 1978 which is codified in the Revised Statutes of Missouri, 1978.

5. Parent was defined by statute as the father and mother of a legitimate child, or the survivor of them, or the natural mother of an illegitimate child, and included any adoptive parent. Ill.Rev.Stat., C. 37, § 701–14.

6. The decision, though issued after the enactment of the current statutory provisions on termination of parental rights, was concerned with the earlier statutes which had been repealed by the time the decision was rendered.

who had also manifested a strong interest in his illegitimate children.

The current Missouri statutes on termination of parental rights reflect the rationale enunciated in *Stanley v. Illinois, supra,* and *State ex rel. J.D.S. v. Edwards, supra.* While the first sentence of Sec. 211.442 defines "parent" to include a biological parent and both the putative father and the mother of an illegitimate child, the definition is modified by the second sentence of that section which recites that the putative father does not acquire a legal relationship to his illegitimate child unless he acknowledges the child "*by affirmatively* asserting his paternity." (Emphasis added.)

The meaning of legal relationship is suggested by the various sections of Chapter 211. Some of these rights and duties are outlined in Sec. 211.021(4) and include the right to care, custody and control of the child and the duty to provide support and discipline. Also included are the right to the earnings of the child, the right to decide where the child will live and the right to represent the child in legal actions. See, Missouri Family Law § 17.9, Juvenile Court (Mo.Bar C.L.E.1970).

■ To determine what effect the inclusion of the term "legal relationship" in the second sentence of Sec. 211.442 has on the definition of parent it is necessary to consider the intent of the legislature in adding the second sentence to the definition. It can be presumed that the legislature was aware of the ruling in *Stanley, supra.* Statutes are treated in *in pari materia* and must be considered together when such statutes shed light on the statute being construed. *State v. Kraus,* 530 S.W.2d 684 (Mo. banc 1975), Section 211.021 and Secs. 211.442–211.562 indicate that the legislature intended that the second sentence of Sec. 211.442 read "The father of an illegitimate child shall have no legal relationship [as a parent] unless he has acknowledged his

child as his own by affirmatively asserting his paternity.

■ Thus, all putative fathers are not parents within the statutory definition of Sec. 211.442. The putative father who does not have a legal relationship to his illegitimate child, that is, who has not affirmatively asserted his paternity, is not a parent as the term "parent" is used in the statutes pertaining to termination of parental rights, Secs. 211.442–211.492.[7] On the other hand, the putative father who has taken steps toward establishing a legal relationship may be defined as a parent.[8] See, e. g., *Cobb v. State Security Ins. Co.,* 576 S.W.2d 726, 736 (Mo. banc 1979) where the court held that when a putative father "has openly acknowledged the child as his, has exercised custody and has shouldered responsibility with respect to supervision, support, protection and care of the child" his right to bring a wrongful death action will be upheld. Moreover, the court stated:

"Under our wrongful death act and under the modern judicial decisions, we conclude therefore that the father, Robert Joe Cobb, had rights as a parent of Rhonda to commence and maintain an action for wrongful death under the policy. Here, Robert acknowledged Rhonda as his child before and after birth; he lived with Norma and the children at the Russell address over a period of years; he openly acknowledged Rhonda as his child to Norma and to others; Norma recognized Robert as the father; Robert gave support, love and affection to the child and disciplined the child. In these circumstances, we cannot say that Robert, and the mother, Norma, are to be deprived of a right of action for wrongful death."

Such an interpretation placing the responsibility for acknowledgment on the putative father is appropriate in light of *In Interest of D.M.H.,* 516 S.W.2d 785, 787[6] (Mo.App. 1974) where the court noted, citing the

---

7. The putative father who has not acknowledged his child by affirmatively asserting paternity is often referred to as an "uncaring" father.

8. Methods of establishing a legal relationship are discussed later.

*Stanley* case, that the burden of proving fatherhood rests with the putative father.[9]

The final clause of Sec. 211.442, the "provided, however" clause, states that an identified parent shall be served by process. The clause refers only to "a parent." It does not state that any identified putative father shall be served. Only a parent, that is, a putative father who acknowledges his child by affirmatively asserting paternity, is entitled to be served. The legislature could properly have enacted a provision allowing any identified putative father, whether or not he had acknowledged the child by affirmatively asserting paternity, to receive notice. It did not do so. Thus, we conclude that the legislature intended that only a putative father who acknowledged his child be notified.

The "provided, however" clause also states that a *parent* need only be served "whose identity is known." Clearly, the clause does not state a requirement for service on a *putative father* whose identity is known. The question of the identity of a putative father is only reached after it has been determined that the putative father is a parent, i. e., that he has acknowledged his child by affirmatively asserting paternity. If he has not acknowledged his child, he is not a parent and his identity need not be established.

■ For these reasons, it is preferable that notice be contingent upon the action of the putative father in identifying himself. Methods of identification may include some of the methods by which the putative father may acknowledge the child, and include: (1) filing an affidavit stating that he is the father; (2) placing his name on the child's birth certificate; or (3) seeking an admission of paternity from the mother which is filed with the court. Other methods of acknowledging his child by affirmatively asserting paternity used in other states include (1) paying the mother's medical and hospital expenses relating to the pregnancy; (2) supporting the child in a continuous and regular manner; (3) living with the mother and child as a family unit; or (4) receiving the child into his home and openly holding out the child as his natural child. Fla.Stat.Ann., Sec. 63.062 (1977); Hawaii Rev.Stat., Sec. 578–2 (1976); Minn. Stat.Ann., Sec. 259–26 (1974 Supp.); 9A U.L.A., Uniform Parentage Act § 4 (1979). See also Section 474.070, Probate Code—Intestate Succession and Wills, which provides for legitimation of an illegitimate child.[10]

The statutes providing for the termination of parental rights seek a *permanent* settlement of custody by a "complete and final divestment of all legal rights, privileges, duties and obligations of the parent and child." In re M____, 393 S.W.2d 109, 116[8] (Mo.App.1965). The interpretation placed here on Sec. 211.442 accomplishes the purpose of the statutory scheme. It provides for a permanent divestiture of the mother's rights and precludes the possibility that the putative father will appear later to assert his parental rights. Custody of the child is legally and permanently transferred to adoptive parents, or to an appropriate agency.

■ There was no evidence here that this putative father had "acknowledged the child as his own by affirmatively asserting his paternity." Relator testified that the putative father did not know of the birth of Baby Girl B. Therefore, based on the particular facts and evidence in this case, we find he is not a parent within the statutes governing termination of parental rights.[11]

---

9. The interested party claimed to be the biological and, hence, putative father of D.M.H. The mother of D.M.H. and her husband sought to adopt D.M.H. and the alleged putative father intervened, seeking a ruling that he was the father of D.M.H., seeking to set aside the adoption and seeking custody of D.M.H. After a hearing, the court found the evidence did not prove that the interested party was actually the biological father.

10. "Section 474.070. Legitimation by marriage. If a man, having by a woman a child or children, afterward intermarries with her and recognizes the child or children to be his, they are thereby legitimated."

11. One writer reasons that a putative father acquires notice by self-information on the theory that "the law imputes knowledge when opportunity and interest, coupled with reasonable care, would necessarily impart it." *U.S. v.*

We believe it was the intent of the legislature in enacting Sec. 211.442 to bring the law of Missouri to the limits delineated in *Stanley, supra,* but not beyond those limits.

The interpretation we have placed upon Section 211.442 also comes within the standard set forth in *Quillion v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), where the child was born to a couple who had never married or established a home together. The mother married Walcott who petitioned to adopt the child, age 12, with the mother's consent. The biological father's objection was overruled because of a Georgia statute which denied the unwed father any power to prevent the adoption of his child. The Supreme Court held that this statute was constitutional as applied to those facts. The *Quillion* case, which arose out of facts different from the case here, established the principle that a father whose relationship to a child is only biological may be treated differently from a father who has established a family relationship with the child and mother.

And, reaffirming this principle, the Supreme Court in *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 1768, 60 L.Ed.2d 297 (1979) [12] stated:

> "In those cases where the father *never has come forward to participate* in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child." (Emphasis added.)

 Having determined that this putative father is not a parent within the statutory definition, this court must reach the question of whether respondent may compel

relator to identify him by use of his contempt power. When relator refused to reply to respondent's inquiry, respondent stated on the record:

> "The Court will again advise you, Miss B‗‗‗, that under the statutory law of this court and of the decisional law of this State, that it is necessary for the Court to order you to tell the Court the name of the known father, so that that known father can be properly summoned and noticed to this Court and have an opportunity to either terminate his parental rights or to claim the custody and accept the parental rights that go with paternity? Do you understand what I have just said?"

Generally, a court has the authority to interrogate witnesses, *Sparks v. Daniels,* 343 S.W.2d 661, 667[5] (Mo.App.1961); *Townsend v. City of Joplin,* 139 Mo.App. 394, 123 S.W. 474, 477[9] (1909), and to punish a recalcitrant witness. See, Sec. 476.110(5) which provides that the court shall have power to punish for contempt persons who refuse to answer a "legal and proper interrogatory." The person refusing to answer may be incarcerated until he or she answers. Sec. 491.200. However, on the facts of this case, respondent stated that he was finding relator guilty of contempt as a result of his interpretations of Secs. 211.442–211.492.

In light of this court's interpretation of Sec. 211.442 that unless a putative father has acknowledged his child by affirmatively asserting paternity he is not a parent, so that he is not entitled to notice, and in light of our determination that the putative father here had not acknowledged his child,

---

*Shelby Iron Co.,* 273 U.S. 571, 47 S.Ct. 515, 71 L.Ed. 781 (1927). Self-information means that a putative father, who engaged in sexual relations with the mother, must know of the potential for pregnancy of the mother and birth of a child. Comment, "The 'Strange Boundaries' of *Stanley*: Providing Notice of Adoption to the Unknown Putative Father," 59 Va.L.Rev. 517, 529 (1973).

**12.** In *Caban,* the unmarried parents lived together for five years as husband and wife, during which period two children were born to

them. They separated and the mother married Mohammed. Eventually Mohammed sought to adopt the children with the mother's consent. The father, Caban, and his wife also sought adoption. Under New York law an unwed mother could veto an adoption, but an unwed father could not. The court's decision granting Mohammed's petition was reversed. The effect of New York law discriminated against unwed fathers even when their identity was known and they had manifested a significant paternal interest in the child.

**94**

the obligation which respondent felt was imposed on him by Secs. 211.442–211.492 does not exist. Respondent has no duty to command the identification of the putative father in order to give him notice. Respondent's finding of contempt was based on his stated misinterpretation and misapplication of the law, and cannot be upheld on that basis.

It is not necessary to reach relator's other contentions that her right to privacy was violated by respondent's order, that her "testimonial privilege not to degrade herself" was violated and that her child's constitutional rights were violated. Constitutional questions such as those presented in relator's other contentions are not decided where they are not essential to a decision of the case. See, e. g., *City of St. Joseph v. Christgen*, 513 S.W.2d 458, 459[1] (Mo.1974); e. g., *General Motors Corp. v. Fair Employment Practices Div.*, 574 S.W.2d 394, 397, N.2 (Mo. banc 1978). Our interpretation of the statutory language in Sec. 211.442 rules the case so that a determination of the constitutional issues raised by relator are not necessary. Thus, we do not decide whether respondent's inquiry into the identity of the putative father was proper when it is challenged as a violation of the mother's right to privacy, or for some other reason not before this court. Under the circumstances of this case, respondent was not obligated by law to pursue an answer to his inquiry. Since the action of the trial court in holding relator in contempt was based on its erroneous interpretation and application of the law, the preliminary writ of prohibition is made absolute.

SMITH, P. J., and SATZ, J., concur.