Jon ROE, Respondent,

v.

Donna ROSS and Steven Ross, Appellants.

No. WD 36595.

Missouri Court of Appeals, Western District.

Dec. 10, 1985.

Steven A. Fritz, Sedalia, for appellants.

Gary William Smith, Sedalia, for respondent.

Before DIXON, P.J., and SOMERVILLE and NUGENT, JJ.

NUGENT, Judge.

Defendant Donna Ross, the unwed mother of a two year old son, appeals a judgment granting visitation to the boy's father, plaintiff Jon Roe. Among her complaints she asserts that the trial judge lacked impartiality and prejudged the ultimate issue whether any visitation should be granted before hearing any of her evidence. The trial court did prejudge the ultimate issue. Accordingly, we reverse and remand the case for a new trial.

Ms. Ross and Mr. Roe met and began dating while they were in high school. A couple of years later, she became pregnant and they decided to marry, but before the baby was born, they fell out, and Mr. Roe cancelled their wedding plans. On February 6, 1983, Ms. Ross gave birth to a baby boy, Steven Michael Ross. At the time of trial, Mr. Roe had seen the baby only twice.

Despite his earlier statements that he wanted nothing more to do with her, Mr. Roe repeatedly contacted Ms. Ross at her parents' home. In November of 1984, he wrote letters to her in which he insisted that she marry him, that she call him daily and whenever she left her parents' home, and that she stop avoiding him. He then threatened that he would continue following her everywhere she went unless she did as he asked. Upon cross-examination, Mr. Roe admitted that on January 17, 1984, the Circuit Court of Pettis County placed him on probation and issued an order restraining him from contacting Donna Ross in the future.

That same month, Jon Roe filed his petition, later amended, seeking a declaration of Steven Ross' paternity, an order allowing him visitation with Steven, and findings establishing his obligations of support.

In her answer, Ms. Ross alleged that Mr. Roe is so emotionally disturbed that he has so continually harassed her and her family as to cause the Circuit Court of Pettis County to issue an order restraining him from contacting her. She also alleged that he is so emotionally disturbed that he poses a threat of serious physical and emotional harm to both her and Steven, that because of his irrational behavior and violent and ungovernable temper he poses a serious and continual threat to the health and mental well-being of Steven, and that under those circumstances the court should not allow visitation between the baby and Mr. Roe. In her answer she requested that the court dismiss the petition, terminate Mr. Roe's parental rights, restrain him from contacting her or the baby, and order him to provide support for the baby. She also requested that the court award her sole custody of Steven Ross with no visitation rights in Mr. Roe.

Ms. Ross later filed an admission of paternity in which she admitted that Jon Roe was the natural father of Steven, but she also set out some specific instances of plaintiff's irrational and violent behavior. To illustrate his emotional instability, Ms. Ross alleged that Mr. Roe told her that if she married him he would put her in the house, close all the window shades and curtains, and would keep her there away from her family and everyone else except

himself. To illustrate his violence, Ms. Ross alleged that when Mr. Roe knew she was seven months pregnant he physically struck and beat her on the abdomen and face and threw her to the pavement face first, giving her a black eye. Again, Ms. Ross pleaded that Mr. Roe was unfit for parentage and poses a serious threat to the physical and mental well-being of herself and Steven.

At trial, the plaintiff Jon Roe testified first. Upon direct examination he first acknowledged that Steven Ross was his son and stated his desire to visit him. He then testified about his willingness to help support Steven and about his monthly income and expenses.

During cross-examination plaintiff Roe denied that he had forced Donna to wear tight fitting clothes during her pregnancy, threatened her with the loss of her child if she told anyone she was pregnant and denied that he had ever struck Ms. Ross in the abdomen, blackened her eye, or started and driven a car while she was sitting on the hood. The defense attorney then asked if he had ever followed Donna after she asked him not to or followed her after the court order of January 17. Plaintiff's attorney objected to that line of questioning as irrelevant. Defense counsel explained that he was trying to demonstrate the father's anti-social personality and sick mental behavior, but the court sustained the objection. Later in cross-examination, Mr. Roe admitted that he was convicted for harassment of Donna Ross and placed on probation.

After plaintiff testified, the trial judge stated that they would be there a long time and he saw no reason for it. He asked plaintiff's counsel who his next witness was. Counsel stated that he would call Jon Roe's mother next. The judge then said,

Let me tell you where we are right now. I'm going to order visitation. I'm going to take as true every allegation made by the [mother] that [the father] was, somewhere four years ago or three years ago, violent to this woman. And that he did it to destroy some property or whatever.

Since nobody wants to be explicit about the times, I don't think it's at all relevant, particularly.

Defense counsel then stated that Ms. Ross had not had a chance to put on any evidence, and the court said: "That's right. I'm just going to tell you where we are, visitation will be allowed.... The issue I think is important here is what sort of visitation we're going to allow." Defense counsel then requested a mistrial because the court had decided the ultimate issue of the case before hearing any evidence from Ms. Ross. The court replied, "It's denied. You bring your witness on then, let's go. I have taken as admitted all your allegations." Defense counsel then explained that the judge had not yet heard defendant's evidence and that she may have additional evidence besides what was contained in her answer. The court then stated that the only evidence he believed to be relevant was that of occurrences after the time of birth. Counsel explained that under the statute the relevant issue was whether a non-custodial parent seeking visitation is going to conduct himself in a way which will be harmful to the health and well-being of the minor child. He requested that the court at least hear his witnesses. The court replied, "Well, we'll hear them but we'll hear them with caution."

In defendant's case, Ms. Ross did present much evidence of the father's violent, domineering, and irrational behavior toward her. At the close of all the evidence, the trial court awarded Ms. Ross primary custody of the baby and granted Mr. Roe weekly visitation. He also found that the evidence presented did not support termination of Mr. Roe's parental rights and ordered Mr. Roe to pay $150.00 per month child support.

In her first point on appeal, the mother argues that the trial court erred in refusing to grant a mistrial or disqualify himself because he demonstrated a clear lack of impartiality and prejudged the ultimate issue by stating that he would order visitation before the defendant had an opportunity to present any evidence.

The father argues that the trial judge did not prejudge the ultimate issue but, by his comments, merely defined it. He then cites ample authority for the proposition that the trial judge has the discretion to control the conduct of the trial and argues that the court must be permitted "to define the issues and the law of the case within the pleadings and exclude evidence inconsistent with or irrelevant to the pleadings." He further argues that the trial court, after considering the pleadings and interrogatories,[1] defined the ultimate issue as being not whether visitation would be allowed but what type of visitation would be allowed. The difficulty with plaintiff's argument is, however, that by her pleadings and proposed proof defendant raised a serious question whether the best interests of the child could tolerate any visitation whatsoever.

The first question to be answered is whether and by what right a putative father is entitled to visitation. The parties and the trial court in this case seem to have assumed that an unwed or putative father is entitled to visitation of his child born out-of-wedlock. In fact, a putative father may have visitation rights, but those rights are not absolute. The case law is sparse regarding the parental rights of a putative father with respect to his child born out-of-wedlock.[2] But in 1978 the Missouri Supreme Court held unconstitutional the then existing statutes that permitted the state to acquire permanent legal custody of an illegitimate child by termination of only the mother's parental rights. *State ex rel. J.D.S. v. Edwards*, 574 S.W.2d 405, 408 (Mo.1978) (en banc). The court held that the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution require that a putative father be given an opportunity for a hearing before his parental rights are severed. The Supreme Court recognized that an unwed father possesses some parental rights which must be terminated before the state may obtain legal custody of his child. The court, however, neither designated which parental rights the putative father possesses nor stated whether they include a right to visitation.

Those statutes interpreted in 1978 have since been replaced by §§ 211.442 and 211.447.[3] The latter section authorizes a juvenile court to terminate the rights of a parent if it finds that the termination is in the best interests of the child and one or more of the prescribed conditions exist. Among the conditions which may spur termination are abandonment of the child for a prescribed period of time or neglect of the child for a period of six months prior to the filing of the termination petition. § 211.447.2(2)(a) and (b). "Abandonment" occurs (among other circumstances) when "[t]he parent has without good cause, left the child without any provision for support and without any communication or visitation from the parent." § 211.447.2(2)(a)b. "Neglect" is defined to include "the failure to provide a child ... in the ... custody of others with a continuing relationship, such as, but not limited to, communication or visitation, and to the extent a parent is financially able, the failure to provide for the child's care." § 211.447.2(2)(b).

The clear implication of § 211.447 is that a parent has a duty to provide his child with a continuing relationship through communication and visitation. "Parent" is defined in § 211.442(2) as

a biological parent or parents of a child ... including both the mother and the putative father of an illegitimate child. The father of an illegitimate child shall have no legal relationship unless he, prior to the entry of a decree under sections

---

1. Mr. Roe asserts that the interrogatories were considered by the trial judge and used as partial justification for his comments. Neither party included the interrogatories in the legal file. If plaintiff's counsel wanted us to consider them he should have filed them himself in accordance with Rule 81.12(c).

2. Since 1968, however, the law has been clear that a putative father has a duty to support his illegitimate children. *E.M.R. v. G.E.R.*, 431 S.W.2d 152, 153 (Mo.1968).

3. All sectional references are to Revised Statutes of Missouri (Cum.Supp.), 1984.

211.442 to 211.492, has acknowledged the child as his own by affirmatively asserting his paternity.

The court in *State ex rel. T.A.B. v. Corrigan*, 600 S.W.2d 87, 91 (Mo.App.1980), interpreted this second paragraph of § 211.-442 to determine whether a putative father who had not previously acknowledged his child was entitled to notice of the termination hearing.[4] That court held that the legislature intended that the father of an illegitimate child shall have no legal relationship as a parent to that child unless he has acknowledged it as his own by affirmatively asserting his paternity. Thus, not all putative fathers enjoy the status of "parents" under the statute. Only those who have previously acknowledged their children are entitled to notice of the termination proceedings.[5]

■ Those termination statutes express an important public policy that only putative fathers who have acknowledged their children should share in parental rights. Although the statutes do not define what those parental rights are, § 211.447 clearly implies that they include a right of visitation in a non-custodial parent. Since that section thus provides that a non-custodial parent has a duty to visit and communicate with his child, a fortiori he must also have a corresponding right of visitation with his child. Thus, a putative father who acknowledges a child as his own by affirmatively asserting his paternity, acquires a right of visitation with that child the same as that enjoyed by other non-custodial parents.

In the context of the case at bar, however, a parent's visitation rights are not absolute. The best interests of the child are always the primary concern of the courts. In this respect, in § 452.400 the legislature has qualified the divorced par-

ent's visitation rights. The public policy expressed in that section applies as well to the putative father. It provides that "[a] parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his emotional development."

In this case, defendant's answer clearly raised the issue whether the father should be granted any visitation rights at all because defendant believed that any visitation would harm the child. For example, she alleged that because of his emotional instability and violent and ungovernable temper, Mr. Roe posed a serious threat to the physical health and emotional well-being of the baby, Steven Ross. She also enumerated several specific instances of the father's irrational and violent behavior. Nevertheless, before Mr. Roe concluded his presentation of evidence and before Ms. Ross had even begun presenting hers, the trial judge announced that he had decided to grant the father visitation. After the mother's attorney requested that the court at least hear her evidence before deciding that issue, the court stated that he had taken all her allegations as admitted, had decided to allow visitation, and had decided that the only remaining issue was what sort of visitation to allow.

Mr. Roe says that the court was merely defining the issues raised by the pleadings. If that is what the trial judge intended to do, he erroneously defined them. If he accepted all of the mother's allegations as true, he must have accepted the allegation that any visitation with the child would seriously threaten his physical and mental well-being. Thus, he could not correctly decide to allow visitation.

4. In 1980 the above quoted paragraph of § 211.-442(2) contained this additional clause, "provided, however, that a parent whose identity is known and who can be personally served shall be served by process ... and made a party to [the termination] action."

5. After the *Corrigan* opinion was handed down, the legislature deleted the clause contained in note 4, *supra,* and recodified it in § 211.453. The new section again states that only a "parent" whose identity is known shall be served with summons, indicating that the legislature approved of the court's interpretation of the statute.

■ Understandably, case law is sparse regarding comments of this sort in a court-tried civil case. Needless to say, a trial judge should at all times maintain an impartial attitude and a status of neutrality. *Crimi v. Crimi,* 479 S.W.2d 195, 197 (Mo.App.1972). An apt example of impermissible judicial behavior is found in *Rutlader v. Rutlader,* 411 S.W.2d 826 (Mo.App.1967), a dissolution proceeding in which the wife in her pleadings requested custody of the children, child support, alimony, and attorneys fees. At a pretrial conference, the judge announced to the wife that he intended to grant her a divorce, custody of the children and $17.50 per week for each child. She asked whether she would be granted alimony, and the judge repeated his statement. At her insistence, the court granted her a trial but awarded her precisely what he told her in advance he would. *Id.* at 831. This court ruled that the trial court had not given the wife a fair trial on the issues of alimony and attorney's fees because the trial judge decided the case in advance of her evidence.

■ This case is worse by far. By his comments, the trial judge here demonstrated his own lack of impartiality by indicating that he had already decided one of the ultimate issues of the case before the mother had an opportunity to present any of her evidence. He did not accord her a fair trial on the question of whether visitation should be allowed at all between the father and the child.

For the foregoing reasons, we affirm that portion of the judgment which finds that plaintiff is the natural father of Steven Michael Ross, and we reverse and remand the case for a new trial on the issue of visitation and award of support with the suggestion that the trial judge recuse himself. With respect to the issue of the termination of plaintiff's parental rights, we note that since the court was not the juvenile court and the plaintiff was not the juvenile officer, the trial court had no jurisdiction to entertain defendant's request for termination. *See* § 211.447. Finally, we deny as totally without merit in these circumstances the respondent's motion to assess damages pursuant to Rule 84.19 for frivolous appeal. Obviously, appellant's appeal in this case was not frivolous.

All concur.