1996 SD 33

**In the Matter of the Termination of Parental Rights Over BABY BOY K., a Minor Child.**

No. 19158.

Supreme Court of South Dakota.

Argued Nov. 30, 1995.

Decided March 27, 1996.

Douglas R. Cummings, Jr., East River Legal Services, Sioux Falls, for appellant W.B.L., Jr.

Duane C. Anderson, Christopherson, Bailin & Anderson, Sioux Falls, for appellee Lutheran Social Services.

Ron J. Volesky, Huron, for appellee adoptive parents.

MILLER, Chief Justice.

[¶ 1] W.B.L., Jr., (W.B.L.) the alleged biological father of a child born out of wedlock, appeals the denial of his motion to vacate an order terminating the parental rights of the child's biological parents. We affirm.

### FACTS

[¶ 2] Mother, an unmarried woman, gave birth to Baby Boy K. [hereinafter Child] on February 12, 1994. Four days later, Mother filed a petition for voluntary termination of parental rights. According to this petition, the natural father of Child was unknown. In an accompanying affidavit, Mother stated:

> [T]hat the alleged natural father of the above named minor child is unknown to her and only known as Daryl; that she cannot further identify him; that no person has come forth to acknowledge paternity; and that if she could identify him by personal observation, she would not know his complete name or address. That [Mother] was in the company of several different people on an evening in May, 1993, that during the course of the evening [Mother] was impregnated by a male unknown to her; that [Mother] did not share this information with anyone until after the birth of the child and has no knowledge of who or how to locate persons who might know this person.

[¶ 3] The trial court ordered that notice of a hearing to terminate parental rights be served by publication in the Sioux Falls Argus Leader newspaper, not less than five days prior to the hearing. Accordingly, a notice appeared in that newspaper on February 19, 1994, addressed "TO: All Whom It May Concern/Daryl." The notice identified Child by Mother's last name (Baby Boy K____.).

[¶ 4] On February 28, 1994, the trial court held a hearing on the petition to terminate parental rights. Mother and a social worker for Lutheran Social Services of South Dakota (LSS) were in attendance. No one appeared in response to the notice published in the newspaper. During the hearing, the following exchange occurred between the trial court and Mother:

The Court: What else—what about the father?

Social Worker: There is a publication in there. She was only able to remember his first name. It was published under his first name. And I think it's after the orders there.

The Court: Okay. What were the circumstances here? The father, you don't know him or—

Mother: It was just a one-night drunken incident.

The Court: And you didn't know his full name?

Mother: No.

The Court: The only reason is, we worry about this because sometimes they come back later and we want to make sure that we have done everything we can to make sure that he's been notified. So you are assured it isn't anybody that you know that may later show up and claim the child?

Mother: Yep.

The Court: You are comfortable with that as well?

Social Worker: Yeah, we talked a lot about it.

The Court: And then you've received nothing in response from the publication?

Social Worker: No, we haven't.

[¶ 5] At the conclusion of the hearing, the trial court signed an order terminating the parental rights of Mother and "the unknown alleged natural father." This order transferred parental rights over Child to LSS for the purpose of adoption. Notice of entry of the judgment was entered on April 8, 1994.

[¶ 6] On July 26, 1994, W.B.L., asserting that he was the natural father of Child, filed a motion to vacate the final order terminating and transferring parental rights over Child. He further requested that the court order blood tests to establish his paternity.

[¶ 7] In an affidavit included with his motion, W.B.L. stated he was unaware of Mother's pregnancy or Child's birth until he was told by a friend of Mother in the second week of March 1994 when Child was about one month old. He stated he immediately confronted Mother and, after initial denials, she admitted he was the father of Child and that Child had been adopted. W.B.L. denied having any actual notice of the previously held hearing to terminate his parental rights until this discussion with Mother. W.B.L.'s affidavit further stated that, after he learned of his fatherhood, he filed a paternity action and requested a writ of habeas corpus before another judge. The paternity action and application for writ of habeas corpus were filed on May 23, 1994.

[¶ 8] In addition to his affidavit, W.B.L. attached a stipulation and agreement signed by himself and Mother, which stated in relevant part:

That during the last two weeks of May, 1993, [W.B.L.] and [Mother] had sexual relations on several occasions.

That [Child] was conceived during the last two weeks of May and that [Mother] did not have sexual relations with any other person during this period.

That [Mother] acknowledges that [W.B.L.] is in fact the biological father of the minor child.

That [Mother] agrees that [W.B.L.] is the fit and proper person to have custody of the parties' minor child.

[¶ 9] LSS opposed W.B.L.'s motion to vacate. According to an affidavit filed by LSS, Mother contacted the LSS social worker on March 30, 1994, and informed her that she had lied about the identity of Child's father. The social worker stated Mother refused to name the father of Child.

[¶ 10] The trial court permitted C.S. and M.S., the custodial and adoptive parents of Child, to intervene and oppose the motion to vacate filed by W.B.L. At the hearing on W.B.L.'s motion, his counsel sought to rely on the affidavits filed by W.B.L. and Mother as proof of the need to vacate the earlier judgment and order blood tests. Neither Mother nor W.B.L. were present at this hearing. The trial court refused to consider the affidavits, indicating they were hearsay. The court reiterated and emphasized its questioning of Mother at the termination hearing and the necessity of an in-court evaluation of Mother's credibility regarding her

current claims of W.B.L.'s paternity. W.B.L.'s counsel then requested an opportunity to subpoena Mother to appear in court. The trial court, however, proceeded to hear arguments from LSS and the adoptive parents in opposition to the motion to vacate. At the conclusion of the hearing, the trial court ruled that it would not reopen the case. The court's conclusions of law read in part:

#### II.

That [Child] was born out of wedlock.

#### III.

That due and proper notice of the hearing to terminate parental rights was given.

#### IV.

That at the termination hearing, the Court determined that the father of the child was Daryl, and his parental rights and those of [Mother] were properly terminated.

#### V.

That pursuant to SDCL 25-6-1.1, a father of an illegitimate child shall have no right to the service of process in adoption, dependency, delinquency, or termination of parental rights proceedings unless he is known and identified by the mother or unless he, prior to the entry of a final order in any of the three proceedings, shall have acknowledged the child as his own by affirmatively asserting paternity, within sixty (60) days after the birth of the child.

#### VI.

That [W.B.L.] was not known to be the father or alleged as the father of [Child] prior to the entry of the final order that terminated the parental rights of [Child's] parents.

#### VII.

That [W.B.L.] has no standing to re-open or contest the Order Terminating Parental Rights.

#### VIII.

That it is in the best interest of the child that the Order Terminating Parental Rights not be vacated.

W.B.L. objected to the trial court's findings and conclusions and proposed alternative findings and conclusions, which the trial court rejected.

[¶ 11] W.B.L. appeals the court's final judgment, contending the trial court erred as a matter of law in concluding (1) he has no standing to reopen or contest the order terminating parental rights; (2) due and proper notice of the hearing to terminate parental rights was given to him; and (3) it was in the best interests of Child that the order terminating parental rights not be vacated.[1] We affirm.

### DECISION

[¶ 12] **I. Did the trial court err as a matter of law in concluding that Father has no standing to reopen or contest the order terminating parental rights?**

[¶ 13] As we explained in *Agar Sch. Dist. No. 58–1 Bd. of Education v. McGee*, 527 N.W.2d 282, 284 (S.D.1995):

"Standing is established through being a 'real party in interest' and it is statutorily controlled." *Wang v. Wang*, 393 N.W.2d 771, 775 (S.D.1986). Under SDCL 15–6–17(a), "[e]very action shall be prosecuted in the name of the real party in interest." The real party in interest requirement for standing is satisfied if the litigant can show " 'that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the Defendant.' " *Parsons v. South Dakota Lottery Commission*, 504 N.W.2d 593, 595 (S.D.

---

1. W.B.L. filed a motion to dismiss the appeal on March 1, 1996. He requested dismissal, because he has since consented to the termination of his parental rights over Baby Boy K. Due to the importance of the issues raised in this appeal, the likelihood of similar controversies arising in the future, and the need for clear guidance in this sensitive area of the law, we denied the motion.

1993) (quoting *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66, 76 (1979)).

[¶ 14] In determining standing the focus is on the party seeking relief, not on the issues he presents. *In re Adoption of Baby Boy D.*, 742 P.2d 1059, 1062 (Okla.1985), *cert. denied*, 484 U.S. 1072, 108 S.Ct. 1042, 98 L.Ed.2d 1005 (1988). We do not consider whether the party filing the challenge "will ultimately be entitled to any relief but whether he has the legal right to seek judicial redress for his grievance." *Id.*

[¶ 15] In his motion to vacate, W.B.L. alleged that he is the natural father of Child. He contends the termination of his parental rights occurred without notice to him and he was, therefore, denied his liberty interest as a parent without due process of law. This Court and the United States Supreme Court have recognized an unwed father's potential liberty interest in his biological child. *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re F.J.F.*, 312 N.W.2d 718, 720–21 (S.D.1981).

[¶ 16] Enforcement of the termination order would destroy any parental rights and responsibilities to which W.B.L. may be entitled. He therefore demonstrated an actual or threatened injury as a result of the allegedly illegal termination of his parental rights. We hold W.B.L. had standing to file the motion to vacate the judgment terminating his parental rights based on his claim that his liberty interest in Child had been infringed. *Accord, Baby Boy D.*, 742 P.2d at 1062 (unmarried father had standing to challenge adoption statutes where termination of his parental rights was accomplished through maternal consent alone). However, for reasons explained later herein, he lost that standing through his own inaction.

[¶ 17] **II. Did the trial court err as a matter of law in concluding that due and proper notice of the hearing to terminate parental rights was given?**

[¶ 18] SDCL 25–6–1.1 provides:

Notwithstanding any other provision of law or court rule the father of an illegitimate child shall, as a requirement of due process, have no rights to the service of process in adoption, dependency, delinquency, or termination of parental rights proceedings unless he is known and identified by the mother or unless he, prior to the entry of a final order, in any of the three proceedings, shall have acknowledged the child as his own by affirmatively asserting paternity, *within sixty days after the birth of the child,*

(1) As outlined in § 25–6–1, or

(2) By causing his name to be affixed to the birth certificate as provided by § 34–25–13.2, or

(3) Otherwise by commencing a judicial proceeding claiming a parental right. (Emphasis supplied.)

SDCL 25–6–1.1 eliminates notice requirements for a father of an illegitimate child unless he (1) is known and identified by the mother or (2) has acknowledged the child as his own by affirmatively asserting paternity within sixty days of the child's birth. W.B.L. did not satisfy either of these mandates. First, he was not "known and identified" by Mother. Although Mother now claims to have known W.B.L. was the father of Child, she did not *identify* him to the judge or adoption officials prior to or during the termination hearing. Second, W.B.L. did not affirmatively assert his paternity within sixty days of Child's birth by any of the three methods outlined in the statute. He did not legitimate Child under SDCL 25–6–1 by "publicly acknowledging [the child] as his own, receiving it as such into his family ... and otherwise treating it as if it were a legitimate child[.]" Nor did W.B.L. cause his name to be affixed to Child's birth certificate. Finally, he did not file a judicial proceeding within sixty days of Child's birth claiming a parental right.

[¶ 19] W.B.L. claims to have learned of Child's birth in the second week of March, 1994, approximately one month after Child was born. He contends that he immediately confronted Mother with his knowledge and

she admitted Child's paternity. Yet, W.B.L. did not file his paternity action and application for writ of habeas corpus until several months later, on May 23, 1994, over three months after Child's birth. Although W.B.L. had knowledge of his potential paternity, he failed to take the timely steps mandated by statute. Having failed to act within the time frame set forth in SDCL 25–6–1.1, W.B.L. was not entitled to notice of termination. In fact, in ordering notice by publication "To Whom It May Concern," the trial court went beyond the minimum requirements of the law. We applaud that extra effort and would encourage other courts to do likewise.

[¶ 20] W.B.L. contends the Due Process Clause of the Fourteenth Amendment demands he be given an opportunity to establish his liberty interest as a parent, in spite of the statutory directive of SDCL 25–6–1.1. The Fourteenth Amendment to the United States Constitution provides, in pertinent part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law[.]" In making his due process claim, W.B.L. relies heavily on our decision in *F.J.F.*, 312 N.W.2d 718. In that case, F.J.F. and his nonidentical twin were declared dependent and neglected children. Six days later, on February 5, 1980, the trial court held a dispositional hearing. F.R., the alleged father, denied paternity and consented to the termination of any parental rights which he may have had in the twins. At the conclusion of the hearing, the trial court ordered termination of the parental rights of F.R. and of the mother of the children. The court granted permanent custody of the twins to the Department of Social Services (DSS) for purposes of adoption. On May 29, 1980, almost three months after the transfer of parental rights, Mr. Henkel petitioned the court to reopen the dependency and neglect proceedings for the purpose of determining his claimed paternity and custody rights to the twins. He alleged that he was not given proper legal notice of the dependency and neglect proceedings. The trial court granted his petition and ordered blood tests of the mother, the children, and Henkel. These tests revealed a 97.27 percent likelihood that Henkel was the father of the male twin, F.J.F., and a zero percent likelihood he was the father of the female twin.

[¶ 21] The trial court consequently determined Henkel was the father of F.J.F. State appealed, contending the trial court lacked jurisdiction to reopen the proceedings to determine paternity. The State argued that Henkel had actual or constructive knowledge of the dependency and neglect proceedings and he should have presented his evidence at that time. In considering this appeal, we noted "the record clearly indicates that Mr. Henkel had actual knowledge of the disposition hearing and that he believed he was the father."[2] *Id.* at 720. Nevertheless, we upheld the trial court's decision to reopen the dependency and neglect proceedings, citing the blood test results as new and material evidence which could affect the original decree. Additionally, referring to several United States Supreme Court cases concerning the liberty interest of unwed fathers, we wrote:

> We believe, however, that an additional, fundamental question of law was activated by the facts. It relates to whether Mr. Henkel could be denied the opportunity to be heard on his claim of paternity. We believe the Due Process Clause of the Fourteenth Amendment to the United States Constitution required the trial court to hear Mr. Henkel's paternity claim and transcended any statute that might otherwise preclude such a hearing. Mr. Henkel had a right to an opportunity to establish his liberty interest as a parent. This interest is guaranteed by the Fourteenth Amendment and protected by the Due Process Clause.
>
> ·    ·    ·    ·    ·
>
> We conclude from the peculiar circumstances of this case that the trial court did not err in ordering a new hearing pursuant to SDCL 26–8–63 and that the constitutional principles expounded in [United States Supreme Court case law] logically mandated the trial court, by virtue of the Due Process Clause, to grant Mr. Henkel a

---

2. Henkel claimed he did not come forward earlier because he did not want to jeopardize the possibility of the mother's family obtaining custody of the twins.

hearing on his paternity claim. Lest our holding be read too broadly, however, we recognize that circumstances may very well exist whereby a right to a paternity hearing must be deemed waived and yield to other considerations.

*F.J.F.*, 312 N.W.2d at 720–21.

[¶ 22] Several important facts distinguish *F.J.F.* from the instant case. In *F.J.F.*, "no one, including Mr. Henkel, knew for certain who was the father of the twins." *Id.* at 720. Mother's marriage to another man contributed to the uncertainty about the children's parentage. Indeed, once blood test results were received, they indicated each twin was fathered by a different person. Given the doubts about the children's parentage and Henkel's hope that other family members would gain custody, his failure to assert his rights earlier is more excusable.

[¶ 23] In this case, Mother was unmarried at the time of her involvement with W.B.L. Furthermore, if W.B.L.'s affidavit and stipulation are accepted as true, W.B.L. was the only person who was sexually involved with Mother at the time of Child's conception. In these circumstances, W.B.L.'s responsibility to promptly assert his parental rights is more compelling.

[¶ 24] Another important difference distinguishes this case from *F.J.F.* In *F.J.F.*, there is no indication that either child had been placed for adoption. Therefore, State's interest in protecting a child's stable, permanent home was not fully activated. In contrast, in this case Child was placed in an existing adoptive home and has formed lasting attachments to his new family. State's interest in preserving a final judgment of termination was significantly enhanced, because it directly related to protecting the stability and permanency of the only home Child had ever known.

[¶ 25] In addition to these foregoing factual differences distinguishing this case from our settled case law, W.B.L. misapprehends the growing body of federal case law that defines and limits the liberty interest of unwed fathers. There are four United States Supreme Court cases that address this question.[3] A review of these cases is fundamental to our understanding of W.B.L.'s due process claim.

[¶ 26] In *Stanley v. Illinois*, 405 U.S. 645, 646, 92 S.Ct. 1208, 1210, 31 L.Ed.2d 551, 555 (1972), Peter Stanley lived with a woman intermittently for eighteen years, during which time they had three children. Stanley and the woman never married. Under Illinois law at the time, the children of unwed fathers became wards of the state upon the death of the mother. The mother of Stanley's children died and the State of Illinois instituted a dependency proceeding. Based on the fact that their mother was dead and their parents had never married, Stanley's children were declared wards of the state and placed with court-appointed guardians. Stanley appealed, claiming he had never been shown to be an unfit parent and that, since married fathers and unwed mothers could not be deprived of their children without such a showing, he had been deprived of equal protection of the laws guaranteed him by the Fourteenth Amendment. The state responded that unmarried fathers were presumed unfit to raise their children. The state reasoned it was therefore unnecessary to hold individualized hearings to ascertain whether particular unwed fathers were in fact unfit before they could be separated from their children.

[¶ 27] On appeal, the United States Supreme Court held that, as a matter of due process of law, Stanley was entitled to a hearing on his fitness as a parent before his children could be taken from him. The Court reasoned that Stanley's interest as a parent outweighed the state's purported interest in the children's welfare. The Court explained:

> [W]hat procedures due process may require under any given set of circumstances must begin with a determination of the

---

**3.** A fifth case, *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), considers whether the presumption of legitimacy given to children born in wedlock infringed upon the due process rights of a man who wished to establish his paternity of a child born to the wife of another man. Because Mother was not married at the time of Child's conception, *Michael H.* has little precedential force in resolving the dispute before this Court.

precise nature of the government function involved as well as of the private interest that has been affected by governmental action.

The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection.

．　．　．　．　．

For its part, the State has made its interest quite plain: Illinois has declared that the aim of the Juvenile Court Act is to protect "the moral, emotional, mental, and physical welfare of the minor and the best interests of the community" and to "strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal[.]"

．　．　．　．　．

... We observe that the State registers no gain towards its declared goals when it separates children from the custody of fit parents. Indeed, if Stanley is a fit father, the State spites its own articulated goals when it needlessly separates him from his family.

．　．　．　．　．

Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.

*Stanley*, 405 U.S. at 650–57, 92 S.Ct. at 1212–15, 31 L.Ed.2d at 558–62 (citations omitted).[4]

[¶ 28] Although *Stanley* seemed to promise broad protection for the biological relationship between a father and an illegitimate child, the holding in *Stanley* was significantly limited in a subsequent case, *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978).

[¶ 29] The *Quilloin* Court considered whether Georgia's adoption law was unconstitutional when the law denied an unwed father the authority to prevent another from adopting his illegitimate child. The child had been in the custody of his mother for his entire life. The mother and the natural father never married or established a home together. When the child was almost three, the mother married another man. When the child was eleven years old, the mother consented to adoption of the child by her husband, and he immediately filed a petition for adoption. The natural father filed an application for a writ of habeas corpus seeking to block the adoption, to legitimate the child, and to secure visitation rights. He did not seek custody or object to the child living with the mother and her husband.

[¶ 30] Under Georgia law at the time of the decision, a child born in wedlock could not be adopted without the consent of each living parent who had not voluntarily surrendered rights in the child or been adjudicated an unfit parent. In contrast, only the consent of the mother was required for adoption of an illegitimate child. To acquire the same authority to veto adoptions that other parents possessed, an unwed father had to legitimate his offspring by marrying the mother and acknowledging the child as his own or by obtaining a court order declaring the child legitimate. The natural father in *Quilloin* had not married the child's mother or petitioned for legitimation of his child prior to the filing of the adoption petition. The trial court granted a consolidated hearing on the petitions for adoption, legitimation, and writ of habeas corpus. The court received extensive testimony from the parties and other witnesses. It found the natural father had provided support on an irregular basis (no support order existed), had visited child on "many occasions," and had given the child toys and gifts "from time to time." 434 U.S. at 251, 98 S.Ct. at 552–53, 54 L.Ed.2d at 517.

---

**4.** The Court further held that, in denying Stanley and other unwed fathers a hearing while granting it to other Illinois parents, the State violated his right to equal protection under the law. 405 U.S. at 658, 92 S.Ct. at 1216, 31 L.Ed.2d at 563.

Because the natural father had failed to marry the mother or obtain an order granting legitimation, the trial court concluded he lacked standing to object to the adoption. Although the trial court did not find the natural father to be unfit, it concluded adoption by mother's husband would be in the child's best interests. The trial court therefore granted the adoption petition and denied the natural father's visitation and legitimation petitions.

[¶ 31] On appeal, the unwed natural father contended he was entitled to the same power to veto an adoption that is provided to married fathers under Georgia law. The Court noted that the natural father had received both notice and a full hearing. The Court framed the issue as "whether, in the circumstances of this case and in light of the authority granted by Georgia law to married fathers, appellant's interests were adequately protected by a 'best interests of the child' standard." 434 U.S. at 254, 98 S.Ct. at 554, 54 L.Ed.2d at 519. Concluding that due process was satisfied, the Court wrote:

We have little doubt that the Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest. *But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived.* Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except [the natural father]. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption and denial of legitimation, were in the "best interests of the child."

434 U.S. at 255, 98 S.Ct. at 555, 54 L.Ed.2d at 520 (citation omitted) (emphasis added). The Court also rejected the natural father's equal protection claim, focusing on the absence of significant responsibility for the child's needs:

We think [the natural father's] interests are readily distinguishable from those of a separated or divorced father, and accordingly believe that the State could permissibly give [the natural father] less veto authority than it provides to a married father.

Although [the natural father] was subject, for the years prior to these proceedings, to essentially the same child-support obligation as a married father would have had ... he has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child. [The natural father] does not complain of his exemption from these responsibilities and, indeed, he does not even now seek custody of his child. In contrast, legal custody of children is, of course, a central aspect of the marital relationship, and even a father whose marriage has broken apart will have borne full responsibility for the rearing of his children during the period of the marriage. Under any standard of review, the State was not foreclosed from recognizing this difference in the extent of commitment to the welfare of the child.

434 U.S. at 256, 98 S.Ct. at 555, 54 L.Ed.2d at 520.

[¶ 32] In *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Court considered an unwed father who, unlike the father in *Quilloin,* had shouldered custodial responsibilities for his children for some time after their birth. Abdiel Caban and Maria Mohammed lived together from September 1968 until the end of 1973. During this time, they represented themselves as being husband and wife, although they were never legally married. While living with Caban, Mohammed gave birth to two children. Caban was identified as the father on each child's birth certificate and lived with them as their father until the end of 1973, when the children were ages four and two. In December 1973, Mohammed left with the two children and took up residence with Kazim

Mohammed, whom she married the following month. Caban maintained contact with the children by visiting them and briefly having them live in his home. In January 1976, when the children were ages six and four, Mohammed and her husband filed a petition to adopt the children. Caban and his new wife cross-petitioned for adoption. A hearing was held on the petitions, where the parties were permitted to present and cross-examine witnesses.

[¶ 33] Under New York law at the time, an unwed mother who had not abandoned or relinquished her child or been adjudicated incompetent to care for the child, could block the adoption of her child simply by withholding consent. The unwed father had no similar control over his child, even when his parental relationship was substantial. He could prevent the termination of his parental rights only by showing that the best interests of the child would not permit the child's adoption by the petitioning couple.

[¶ 34] In making its decision on the adoption petitions, the trial court noted that an unwed father's consent to a stepparent adoption was not required by state law. The court further noted that Caban was foreclosed from adopting the children, as the natural mother had withheld her consent. Given Caban's legal inability to adopt the children, the court considered the Cabans' evidence only to the extent it reflected on the Mohammeds' qualifications as prospective parents. Finding the Mohammeds to be fit parents, the trial court granted their petition to adopt and thereby cut off all of Caban's parental rights and obligations.

[¶ 35] On appeal, Caban argued that the distinction drawn under New York law between the adoption rights of unwed fathers and those of other parents violated the Equal Protection Clause of the Fourteenth Amendment. He also argued that natural fathers have a due process right to maintain a parental relationship with their children absent a finding that they are unfit as parents.

[¶ 36] Disposing of the case on equal protection grounds, the Court invalidated the New York law, because the gender-based distinction between unmarried mothers and unmarried fathers did not bear a substantial relation to the state's interest in providing adoptive homes for illegitimate children. 441 U.S. at 391, 99 S.Ct. at 1767–68, 60 L.Ed.2d at 306–07. In so holding, the Court emphasized that a gender-neutral statute would not create a strong impediment to adoption proceedings. The Court reasoned that the state's interest in proceeding with adoption cases could be better served by distinguishing between natural fathers who have developed relationships with their children and those who have not:

> *In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the state from withholding from him the privilege of vetoing the adoption of that child.* Indeed, under the statute as it now stands the surrogate may proceed in the absence of consent when the parent whose consent otherwise would be required never has come forward or has abandoned the child. But in cases such as this, where the father has established a substantial relationship with the child and has admitted his paternity, a State should have *no difficulty in identifying the father even of children born out of wedlock.* Thus, no showing has been made that the different treatment afforded unmarried fathers and unmarried mothers … bears a substantial relationship to the proclaimed interest of the State in promoting the adoption of illegitimate children.

*Caban,* 441 U.S. at 392–93, 99 S.Ct. at 1768–69, 60 L.Ed.2d at 307–08 (citations omitted) (emphasis added). The Court was also careful to distinguish this case, where the adoption of older children was sought, from cases where newborn infants are involved.

> Because the question is not before us, we express no view whether [difficulties in locating unwed fathers] would justify a statute addressed particularly to newborn adoptions, setting forth more stringent requirements concerning the acknowledgement of paternity or a stricter definition of abandonment.

441 U.S. at 392 n. 11, 99 S.Ct. at 1768 n. 11, 60 L.Ed.2d at 307 n. 11. The Court also declined to consider whether a state is constitutionally barred from ordering adoption in

the absence of a determination that the parent whose rights are being terminated is unfit. 441 U.S. at 394 n. 16, 99 S.Ct. at 1769 n. 16, 60 L.Ed.2d at 308 n. 16.

[¶ 37] In *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614, (1983), the Court reinforced the constitutional distinction between unwed fathers who have developed strong custodial and personal relationships with their children and those who have not. The Court held that the United States Constitution does not give an unwed father an *absolute* right to notice and an opportunity to be heard before his child may be adopted. 463 U.S. at 250, 103 S.Ct. at 2987, 77 L.Ed.2d at 619.

[¶ 38] The illegitimate child in *Lehr* was born on November 9, 1976. Her mother and biological father never married. The child resided with her mother and, although her natural father visited sporadically, the child was never in his custody. Eight months after the child's birth, her mother married another man. When the child was over two years old, the mother's husband petitioned a New York court to adopt the child.

[¶ 39] Under New York law in effect at that time, notice of adoption proceedings had to be given to the following classes of putative fathers of children born out of wedlock: (1) those who have been adjudicated to be the father; (2) those who have been identified as the father on the child's birth certificate; (3) those who live openly with the child and the child's mother and who hold themselves out to be the father; (4) those who have been identified as the father by the mother in a sworn written statement; (5) those who were married to the child's mother before the child was six months old; and (6) those who have filed with the state's "putative father registry," thereby demonstrating their intent to claim paternity of the illegitimate child. The unmarried father in *Lehr* did not fall into any of these categories. Therefore, he was never served with notice of the adoption petition. He learned of the adoption proceeding on his own two and a half months after the petition was filed. Although the mother of the child and her husband gave testimony at the adoption hearing, the natural father was never given an oppor-

tunity to participate. After hearing the testimony of the mother and her husband and receiving a favorable report on their parenting abilities from the county social services department, the trial court entered an order of adoption.

[¶ 40] On appeal, the natural father challenged the adoption order as violative of the Fourteenth Amendment. First, he claimed a putative father's actual or potential relationship with an illegitimate child is an interest in liberty which may not be destroyed without notice and an opportunity to be heard. Second, he contended the New York adoption statutes gave him fewer procedural rights than the mother of a child born out of wedlock and, therefore, violated the Equal Protection Clause.

[¶ 41] In rejecting the natural father's claims, the Court emphasized "the clear distinction between a mere biological relationship and an actual relationship of parental responsibility." 463 U.S. at 259–60, 103 S.Ct. at 2992, 77 L.Ed.2d at 625. The Court observed:

> Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.

463 U.S. at 260, 103 S.Ct. at 2992, 77 L.Ed.2d at 626 (citing *Caban,* 441 U.S. at 397, 99 S.Ct. at 1770, 60 L.Ed.2d at 297) (Stewart, J., dissenting) (emphasis deleted). In an effort to reconcile its earlier cases and lay down a principle of law for settling future disputes, the Court explained:

> The difference between the developed parent-child relationship that was implicated in *Stanley* and *Caban,* and the potential relationship involved in *Quilloin* and this case, is both clear and significant. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges

neither create nor sever genetic bonds. "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children ... as well as from the fact of blood relationship."

463 U.S. at 261, 103 S.Ct. at 2993, 77 L.Ed.2d at 626 (citations omitted).

[¶ 42] Rather than recognizing an absolute liberty interest, the Court determined an unwed father has an "opportunity" interest that he must *promptly grasp* in order to merit constitutional protection:

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

463 U.S. at 262, 103 S.Ct. at 2993–94, 77 L.Ed.2d at 627. Noting that the natural father in the case before it had never had any significant custodial, personal, or financial relationship with his two-year-old child, and did not seek to establish a legal tie until after her second birthday, the Court upheld the New York statute's denial of notice and a hearing to him.[5] 463 U.S. at 262–63, 103 S.Ct. at 2994, 77 L.Ed.2d at 627.

[¶ 43] The question presented in the case before us is whether W.B.L. timely asserted his opportunity interest so as to trigger greater due process protections than were afforded to him under South Dakota law. Because children require early and consistent nurturing of their emotional as well as physical needs, an unwed father must act quickly to grasp the opportunity interest in his biological child.

Children are not static objects. They grow and develop, and their proper growth and development require more than day-to-day satisfaction of their physical needs. Their growth and development also require day-to-day satisfaction of their emotional needs, and a primary emotional need is for permanence and stability. Only when their emotional needs are satisfied can children develop the emotional attachments that have independent constitutional significance. A child's need for permanence and stability, like his or her other needs, cannot be postponed. It must be provided early. That need for early assurance of permanence and stability is an essential factor in the constitutional determination of whether to protect a parent's relationship with his or her child. The basis for constitutional protection is missing if the parent seeking it does not take on the parental responsibilities timely. The opportunity is fleeting. If it is not, or cannot, be grasped in time, it will be lost.

Elizabeth Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson,* 45 Ohio StLJ 313, 364 (1984). As noted above, the United States Supreme Court has not articulated a time frame for an unmarried father to assert an opportunity interest in his *newborn* child. How much time must pass before an unwed father has relinquished his opportunity interest in his newborn child?

[¶ 44] To guide states in resolving this question, the National Conference of Commissioners on Uniform State Laws has promulgated the Uniform Adoption Act (UAA). The UAA sets forth a framework for balancing the rights of adoptive and biological parents of illegitimate children. This frame-

---

5. The Court also rejected the natural father's equal protection claim. The Court wrote: "[T]he existence or nonexistence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the parent and the interests of the child.... If one parent has an established custodial relationship with the child and the other parent has either abandoned or never established a relationship, the Equal Protection Clause does not prevent a State from according the two parents different legal rights." *Lehr,* 463 U.S. at 266–68, 103 S.Ct. at 2996–97, 77 L.Ed.2d at 630–31.

work favors the biological father's interest during the first six months of the child's life.

> Upon challenge to the adoption of a child less than six months of age, [the petitioners for adoption] must establish (1) by clear and convincing evidence a ground constituting abandonment (which may include evidence of prenatal abandonment) or, alternatively, that the father has been convicted of certain [violent] crimes, or is not the legal, adoptive, or genetic father of the child, and (2) by a preponderance of the evidence that termination is in the best interests of the child. Once this is done, the burden then shifts to [the natural father] to rebut, including proving by a preponderance of the evidence a compelling explanation why any abandonment occurred (such as poverty, deception by the mother, and so forth). If the [natural father] presents such proof, the burden then shifts back to the potential adoptive parents to establish one of four factors that would weigh in favor of terminating parental rights, including further consideration of the child's best interests.

*In re Adoption of E.A.W.*, 658 So.2d 961, 973 (Fla.1995) (Kogan, J., concurring in part and dissenting in part) (citing Uniform Adoption Act § 3–504 (1994)), *cert. denied, G.W.B. v. J.S.W.*, —— U.S. ——, 116 S.Ct. 719, 133 L.Ed.2d 672 (1996). New York courts also favor an unwed father who has asserted his parental interest within six months of his child's birth. *Robert O. v. Russell K.*, 80 N.Y.2d 254, 590 N.Y.S.2d 37, 41, 604 N.E.2d 99, 103 (1992) (citing *In re Raquel Marie X.*, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418 (1990)) ("[A] father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship.").

[¶ 45] Other jurisdictions have taken a less lenient view, giving the unwed father less time to grasp his opportunity interest. For example, some jurisdictions have endorsed a window of time shorter than the sixty-day period set forth in SDCL 25–6–1.1. The Ohio Court of Appeals has upheld a state statute that requires the unwed father to file an objection within thirty days of his child's placement with the prospective adoptive parents. *In re Adoption of Baby Girl Hudnall*, 71 Ohio App.3d 376, 594 N.E.2d 45, 47 (1991). The Ohio court rejected the claim of an unmarried father that was filed forty-three days after the adoptive placement of his newborn child. *Id.* 594 N.E.2d at 47.

[¶ 46] In Utah, if the unwed father is not openly living in the child's household and he is not designated as the child's father on the birth certificate, his right to veto an adoption is preserved only if he files a notice of paternity proceeding prior to the mother's relinquishment of the child to a licensed child placing agency or prior to the filing of a petition for adoption.[6] Utah Code Ann. §§ 78–30–4.13 (1995); 78–30–4.14 (1995). The mother may relinquish the child or prospective adoptive parents may file an adoption petition within a few days of the child's birth. *Sanchez v. L.D.S. Social Services*, 680 P.2d 753, 755 (Utah 1984), (mother relinquished child to adoption agency three days after child's birth); *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 687–88 (Utah 1986) (adoption petition filed two days after child was born). In requiring such prompt compliance by the unwed father, the Utah Legislature declared: "An unmarried biological father, by virtue of the fact that he has engaged in a sexual relationship with a woman, is deemed to be on notice that a pregnancy and an adoption proceeding regarding that child may occur, and has a duty to protect his own rights and interests." Utah Code Ann. § 78–30–4.13 (1995).

[¶ 47] Some courts even consider the biological father's indifferent or abusive conduct during the mother's pregnancy as indicative of his intent to relinquish rights to the illegit-

---

6. The Utah Legislature has created an exception to this requirement where the unwed father is residing in another state, is unable to locate the mother of the child through reasonable means, and has complied with the other state's requirements for preserving his parental interest in the child. Utah Code Ann. § 78–30–4.15 (1995).

imate child. In *E.A.W.*, 658 So.2d at 965, the Florida Supreme Court held that the unwed father's lack of emotional support and/or emotional abuse toward the child's mother during pregnancy could be considered in determining whether the father had abandoned the newborn child. *See also Baby Boy D.*, 742 P.2d 1059 (adoption of illegitimate child without actual notice to father was constitutionally sound where father was aware of mother's pregnancy but did not provide emotional or financial support during pregnancy or at child's birth and did not file claim of paternity until fifty-one days after child's birth).

■ [¶ 48] Clearly, there is some persuasive authority to support the time frame set forth in SDCL 25–6–1.1. In addition, we recognize the State's compelling interest in providing unwanted and unclaimed newborn children with stable, caring homes. Balancing this interest against the father's opportunity interest in his illegitimate child, we conclude the sixty-day window of time after the child's birth comports with due process requirements.

■ [¶ 49] W.B.L. suggests that Mother's failure to tell him of her pregnancy and her alleged misrepresentations to the trial court should create an exception to the sixty-day time period in his case. We do not agree that the facts in this case warrant such an exception. Several cases have considered the impact of the unwed mother's decision to conceal the child's birth. In *In re Petition of Doe*, 159 Ill.2d 347, 202 Ill.Dec. 535, 638 N.E.2d 181 (1994), *cert. denied,* —— U.S —— , 115 S.Ct. 499, 130 L.Ed.2d 408 (1994), the biological father provided for all of the mother's expenses during the first eight months of her pregnancy. Based on a rumor that the father had formed a romantic relationship with another woman, the mother left their apartment. Four days after the child's birth, the mother consented to its adoption. She informed the adoptive parents' attorney that she knew the identity of the father, but would not reveal it. The mother warded off the natural father's persistent inquiries about the child by telling him that the child died shortly after birth. Fifty-seven days after the child's birth, the natural father learned that the child was alive and had been placed for adoption. The same day, he filed an appearance contesting the adoption of his child. The trial court concluded that the father was unfit because he had not shown a reasonable degree of interest in the child within the first thirty days of the child's life as required by Illinois law. The trial court therefore granted the adoption. On appeal, the Illinois Supreme Court determined the unmarried father had shown a reasonable degree of interest in the child, having made various attempts to locate the child that were frustrated or blocked by the mother. The court further noted that mother's deceit was aided by the attorney for the adoptive parents, who failed to make any effort to ascertain the name or address of the father in spite of the fact mother indicated she knew who he was. Finding father had had no opportunity to discharge his familial duty, the court reversed the adoption order. Although the child had lived with the adoptive parents for three years while the case was tried and appealed, the court did not permit the adoptive parents to benefit by that fact. The court wrote:

> To the extent that it is relevant to assign fault in this case, the fault here lies initially with the mother, who fraudulently tried to deprive the father of his rights, and secondly, with the adoptive parents and their attorney, who proceeded with the adoption when they knew that a real father was out there who had been denied knowledge of his baby's existence. When the father entered his appearance in the adoption proceedings 57 days after the baby's birth and demanded his rights as a father, the petitioners should have relinquished the baby at that time. It was their decision to prolong this litigation through a lengthy, and ultimately fruitless, appeal.

*In re Doe*, 202 Ill.Dec. at 536, 638 N.E.2d at 182.

[¶ 50] W.B.L.'s case is clearly distinguishable from *Doe*. First, the father in *Doe* supported the mother during eight months of pregnancy, thereby evincing a willingness to commit to the support of the child. Additionally, the father persistently inquired about the child after its birth. *Id.* He imme-

diately asserted his parental interest by legal means when he discovered that his child was alive and had been placed for adoption. *Id.* In contrast, W.B.L.'s relationship with Mother spanned a two-week period, at most. He did not provide emotional or financial support to Mother during her pregnancy. Indeed, W.B.L. does not allege any attempts by him to contact Mother and/or determine whether she was pregnant after their brief relationship at the end of May, 1993. Nor did he immediately take legal action upon learning of Child's birth. W.B.L. claims he became aware of Child in the second week of March, 1994, which is approximately thirty days after Child's birth. Had he filed his paternity claim at that time or within the thirty or so days that followed, he would have complied with the mandates of SDCL 25–6–1.1 and preserved his due process interest in Child. Instead, W.B.L. delayed filing his paternity claim for over two months after learning of Child's birth. Unlike the father in *Doe,* he offers no reasonable or convincing explanation for this delay. The law " 'does not require either a trial judge or a litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights.' " *Hudnall,* 594 N.E.2d at 48 (quoting *Lehr,* 463 U.S. at 265, 103 S.Ct. at 2995, 77 L.Ed.2d at 629).

[¶ 51] Other courts considering cases similar to this one have squarely placed the responsibility for promptly asserting parental rights on the unwed father, even when the mother of the child has attempted to prevent the father's knowledge of or contact with the child. In *In re Adoption of S.J.B.,* 294 Ark. 598, 745 S.W.2d 606 (1988), an unmarried woman gave birth to a child as a result of an isolated sexual encounter with the biological father. The mother declined to reveal the identity of the biological father for religious and privacy reasons. She also made no effort to notify him of the child's birth. The father was therefore apparently unaware of the child. The mother consented to adoption of the child by a married couple, but the trial court effectively terminated adoption proceedings, ruling that lack of notice to the natural father violated the due process and equal protection clauses of the United States Constitution. On appeal, the Arkansas Supreme Court reversed. While acknowledging that the natural father was probably unaware of the child's existence, the court emphasized that he "was not interested enough in the outcome of his sexual encounter with this fifteen-year-old girl to even inquire concerning the possibility of her pregnancy." *Id.* 745 S.W.2d at 607. The court reasoned that his indifference and resulting failure to assert paternity by establishing a relationship with the child or instituting judicial proceedings made his consent unnecessary to the adoption proceedings:

> [T]he putative father did not avail himself of [the statutory procedure for establishing paternity], nor did he take any affirmative action concerning his paternity or inquire about the possibility of his fatherhood. We therefore conclude that an unmarried father lacking any substantial relationship with his child is not entitled to notice of the child's adoption proceeding under either the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

*Id.* 745 S.W.2d at 609.

[¶ 52] Similarly, in *Robert O.,* 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99, the putative father had no knowledge of the illegitimate child's birth until eighteen months after its birth and ten months after the completed adoption. The New York Court of Appeals reasoned that "an unwed father who has *promptly* done all that he could to protect his parental interest is entitled to constitutional protection." *Id.* 590 N.Y.S.2d at 41, 604 N.E.2d at 103 (emphasis supplied). However, the court stated that "promptness is measured in terms of the baby's life not by the onset of the father's awareness." *Id.* The court explained that the child's need for a permanent family justified this seemingly harsh rule: "The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability." *Id.* 590 N.Y.S.2d at 41–42, 604 N.E.2d at 103–04. The court concluded that the father, who did not file proceedings until ten months after the child's

adoption, had failed to timely assert his parental interest. *Id.* 590 N.Y.S.2d at 43, 604 N.E.2d at 105. *See also In re Adoption of A.M.B.,* 514 N.W.2d 670, 673 (N.D.1994) (mother's attempts to frustrate father's visitation with illegitimate child do not alone excuse the noncustodial parent from efforts to build a relationship with the child). *Hylland v. Doe,* 126 Or.App. 86, 867 P.2d 551, 556–57 (1994) (ruling that mother's concealment of newborn child's whereabouts did not excuse father of his obligation to timely assert his paternity in accordance with Oregon law), *review denied,* 318 Or. 478, 871 P.2d 123 (Or.1994); *In re Child Whose First Name is Baby Girl,* 206 A.D.2d 932, 615 N.Y.S.2d 800, 801 (1994) (holding "the attempt by the father to measure the timeliness of his parental efforts from the date he contends he became aware of the existence of the child is not supported in law"); *State ex rel. T.A.B. v. Corrigan,* 600 S.W.2d 87, 91–92 (Mo.Ct.App. 1980) (holding mother had no obligation to reveal identity of father of illegitimate child placed for adoption where father had not asserted his paternity); *In re Juvenile Action No. JS–8490,* 179 Ariz. 102, 876 P.2d 1137, 1141 (1994) (stating the requirement that an unwed father grasp his opportunity interest "includes investigating the possibility that the child might be his"); *Buchanan,* 45 Ohio St.L.J. at 368 ("Blood gives the father the absolute first chance to perform the constitutional duties [of parenting]. If he fails, *regardless of his blamelessness,* the critical requirement of stability for the child precludes a second chance.") (Emphasis added.)

[¶ 53] When a putative father is ignorant of his parenthood due to his own fleeting relationship with the mother and her unwillingness to later notify him of her pregnancy, the child should not be made to suffer. The trial court in this case was faced with a child who was unwanted by his mother and unknown to his father. After sixty days had passed and *no one had asserted a paternal interest,* the State's obligation to provide this unwanted and unclaimed child with a permanent, capable, and loving family became paramount. W.B.L.'s assertion, another month later, that Mother should have told him if he happened to father a child, cannot overcome the State's

fully matured interest in protecting the child's permanent home.

[¶ 54] We also note Mother's alleged dishonesty was a private act in which the State was also deceived. W.B.L. cannot claim illegal state action where the State was itself a victim rather than a perpetrator. *In re Petition of Steve B.D.,* 112 Idaho 22, 730 P.2d 942, 945 (1986) (holding "no violation of Fourteenth Amendment lies unless 'state action,' not merely the actions of private persons, thwarts the unwed father's 'grasp' ").

[¶ 55] Beyond Mother's alleged improper behavior, the record does not adequately explain W.B.L.'s failure to assert paternity in March, 1994, when he apparently first learned of Child's birth. He waited another two months to file his habeas corpus claim, and he gives no persuasive explanation for this delay. Having failed to promptly grasp his opportunity interest in Child, W.B.L.'s due process rights were not violated by the operation of the sixty-day time period in SDCL 25–6–1.1.

[¶ 56] **III. Did the trial court err as a matter of law in concluding that it is in the best interest of Child that the order terminating parental rights not be vacated?**

[¶ 57] Invoking SDCL 15–6–60(b)(1), (2), (3), (4) and (6), W.B.L. filed a motion to vacate the order terminating and transferring parental rights over Child. The relevant portions of SDCL 15–6–60 read as follows:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(1) Mistake, inadvertence, surprise, or excusable neglect;

(2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under § 15–6–59(b);

(3) Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(4) The judgment is void;

.    .    .    .    .

(6) Any other reason justifying relief from the operation of the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order or proceeding was entered or taken.

[¶ 58] The trial court concluded "[t]hat it is in the best interest of the child that the Order Terminating Parental Rights not be vacated." The trial court made no additional findings or conclusions regarding the application of SDCL 15–6–60(b) to the facts of this case. W.B.L. contends the trial court erred as a matter of law in denying his motion to vacate the order terminating parental rights over Child. He argues that the order should have been vacated because of excusable neglect, newly discovered evidence, fraud, or the demands of justice.

[¶ 59] W.B.L.'s motion to vacate is inextricably bound to the prompt assertion of his due process rights in Child. Indeed, in challenging the court's denial of the motion, he emphasizes the same facts that we considered in ruling on his due process claim—the effect of Mother's alleged misrepresentations to the trial court, W.B.L.'s belated discovery of the child's birth, the reasonableness of his delay in asserting his rights, and the nature of his parental interest as compared to the State's interest in preserving Child's permanent home. Our earlier review of these facts showed that W.B.L. forfeited his opportunity interest in Child.

[¶ 60] Having relinquished his parental rights, he cannot now claim that the denial of the motion to vacate was improper. As the United States Supreme Court has observed, the doctrine of standing requires that an individual *"maintain* a 'personal stake' in the outcome of the litigation *throughout its course." Gollust v. Mendell,* 501 U.S. 115, 126, 111 S.Ct. 2173, 2180, 115 L.Ed.2d 109, 121 (1991) (citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 395–97, 100 S.Ct. 1202, 1208–09, 63 L.Ed.2d 479 (1980)) (emphasis supplied). Certainly, W.B.L. was entitled to an opportunity to show that he had preserved his parental interest in Child and that the termination of his parental rights was unconstitutional. However, once the court determined his con-

stitutional interests as a parent had been *relinquished* rather than infringed, any actual or threatened injury to W.B.L. vanished. Unable to assert any such injury, W.B.L. "lost standing" to assert a motion to vacate the termination order. *See, e.g., Blasband v. Rales,* 971 F.2d 1034, 1041 (3rd Cir.1992) (acknowledging general rule that a plaintiff shareholder "loses standing" to bring a derivative action when he or she loses stock as a result of a merger); *Powder River Basin Resource Council v. Babbitt,* 54 F.3d 1477, 1485 (10th Cir.1995) (ruling plaintiff "lost standing" to challenge attorney fees provision in state's surface mining statutory scheme when state appellate court awarded plaintiff's attorney fees); *Lopez v. Garriga,* 917 F.2d 63, 67 (1st Cir.1990) (noting "a court does not retain authority to grant an injunction, even though the plaintiff originally had standing to ask for one, if during the course of the proceeding the plaintiff loses his toehold on the standing ladder"); *Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 856 (D.Minn. 1989) (ruling that, upon filing a petition for bankruptcy, a debtor loses standing to pursue any causes of action as those claims become part of the bankruptcy estate).

[¶ 61] W.B.L. initially had standing to assert his due process opportunity interest in Child; his assertion that he was prevented from exercising his opportunity interest satisfied the injury requirement for standing and warranted judicial consideration of his due process claim. However, he "lost" standing once the trial court determined that he had relinquished his due process right in Child by failing to comply with SDCL 25–6–1.1. The motion to vacate was therefore properly denied.

[¶ 62] Affirmed.

[¶ 63] AMUNDSON, KONENKAMP, and GILBERTSON, JJ., concur.

[¶ 64] SABERS, J., concurs in part and concurs in result in part.

SABERS, Justice, concurring in part and concurring in result in part.

[¶ 65] I concur on issue 1 because the Father had standing to challenge the order terminating parental rights.

[¶ 66] I concur in result on issue 2 because the father received due and proper notice of

the hearing to terminate parental rights through legal publication of the summons.

[¶ 67] Since the constitutions of South Dakota and the United States guarantee the right to due process, the South Dakota legislature cannot abolish due process through a statute. In other words, what the constitutions give or guarantee cannot be taken away by statute.[1]

[¶ 68] Therefore, to the extent that SDCL 25–6–1.1 purports to set up conditions "as a requirement of due process," it is unconstitutional. However, to the extent that it purports to extinguish the parental rights of a father of an illegitimate child under certain conditions, it may be reasonable and constitutional.

[¶ 69] Based on this record, W.B.L. is the natural father of the child. Therefore, he was entitled to due process as guaranteed by the South Dakota and United States constitutions. W.B.L. received due process through notice of the hearing by publication of the summons. Notice was given so that he had an opportunity to be heard. Whether he received actual notice at that time is immaterial to the holding. He received his due process rights through legal publication and the court had jurisdiction to determine his parental rights to the child under SDCL 25–6–1.1. The court terminated his parental rights under the statute and the judgment

was final subject only to appeal or motion under SDCL 15–6–60(b).

[¶ 70] After the mother advised W.B.L. that he *was* the father, the court needed to and did hold a hearing to determine that he received his due process rights as indicated above in order to affirm the judgment terminating his parental rights. However, had he not received due process through legal publication, he would be able to challenge the prior termination of his parental rights and have a hearing *on the merits*.

[¶ 71] Legal publication of the summons is, ·in the long run, the best safeguard of the rights of the natural father, the adoptive parents *and* the illegitimate child because it eliminates the uncertainty and confusion of a subsequent challenge on the merits.

[¶ 72] Due process does not require a hearing or actual notice in all such instances. It requires notice and an opportunity to be heard. There is a real difference. Notice may be satisfied by legal publication, which does not guarantee actual notice.[2] However, it is adequate for due process because it resists or minimizes fraud, deception and secrecy. Therefore, not unlike Democracy, it is adequate even if ineffective on occasions.

[¶ 73] Therefore, I cannot agree with the majority's conclusion that "the trial court went beyond the minimum requirements of the law" by "ordering notice by publication." In my view, notice of a hearing for the

---

1. I recognize that other states have also set up conditions precedent to due process rights. Some require specific conduct by the father or his registration with the State before he receives due process rights. *See e.g.,* AlaCode §§ 26–10A–7, 26–10A–17 (1992); ArizRevStatAnn § 8–106 (1989 & Supp 1995); MinnStat §§ 259.49, 259.51 (1992 & Supp 1996). I challenge those theories as inadequate for the reasons stated herein and because, in situations similar to this, it permits the mother to deceive the court without any public notice. A better solution is represented by the Nebraska Notice statutes, which provide for notice to biological fathers, including "any other person who the agency or attorney representing the biological mother may have reason to believe may be the biological father of the child." NebRevStat § 43–104.12(7) (Supp 1995).

   Nebraska also requires notification of possible biological fathers by publication if the agency or attorney representing the mother "is unable through reasonable efforts to locate" the biological father. NebRevStat § 43–104.14. Exceptions are made if the conception is the result of

sexual assault or incest or if the mother's or child's safety would be threatened. NebRevStat § 43–104.15. However, if the biological father is not given actual or constructive notice, the attorney or agency "shall give the adoptive parents a statement of legal risk," which indicates the legal status of the father's rights at the time of placement. NebRevStat § 43–104.15. The attorney or agency must file a statement that it used due diligence to give notice to the father. NebRev Stat § 43–104.16. The trial court determines whether there has been substantial compliance with the notice statutes or may appoint a guardian ad litem to represent the interests of the biological father if due diligence is lacking. NebRevStat § 43–104–18.

2. I recognize the deficiencies of legal publication. Frequently, it does not give actual notice. Critics have pointed out it is expensive and time-consuming but ineffective. *See* Homer H. Clark, The Law of Domestic Relations in the United States, § 21.2, at 582–83 (1987). It may, however, tend to eliminate challenges on the merits in situations like the present appeal.

**104**

termination of parental rights is clearly set forth in the South Dakota statutes in SDCL 25–5A–9,[3] 25–5A–11,[4] 25–5A–12 [5] and 26–7A–48.[6] Here, the court complied with these statutes and therefore, due and proper notice of the hearing to terminate parental rights was given.

[¶ 74] Without the due process safeguards provided herein, the rights of the natural father to his child can be arbitrarily terminated. Even more important, without these safeguards, the rights of an illegitimate child to his natural father could be arbitrarily terminated just because the child is illegitimate.

[¶ 75] Even though it appears the trial court did not err in concluding it was in the child's best interest not to vacate the order terminating parental rights, it is unnecessary to reach issue 3.

3. SDCL 25–5A–9 provides:

If a petition for the voluntary termination of parental rights is filed, the court shall set a date for a hearing thereon, and shall cause notice of the time, place, and purpose of the hearing to be served upon the parent or parents. No such notice is necessary if a waiver executed by the parent or parents has been filed with the petition. The court may require notice to be served upon any other person or organization and shall require notice to be served upon the Department of Social Services if the petition indicated that aid to families with dependent children benefits were ever received on behalf of the minor child in accordance with § 25–5A–6(9). Any failure to provide notice to the Department of Social Services pursuant to this section does not invalidate the proceedings.

4. SDCL 25–5A–11 provides:

A notice required pursuant to § 25–5A–9, may be served by any person authorized by the laws of this state to serve a summons in a civil action. Such notice shall be personally served upon every person required to be served if such person resides within the state and may be served upon such person, if without the state, by like personal service or by publication as provided in § 25–5A–12. Such service, whether personally or by publication, shall be made at least five days prior to the time for hearing.

5. SDCL 25–5A–12 provides:

If the court finds that personal service as provided in § 25–5A–11 cannot be accomplished, the court shall publish notice of the time, place and purpose of the hearing as provided in § 26–

7A–48. The form and wording of notice shall be prescribed by the court.

6. SDCL 26–7A–48 provides:

If the petition or an affidavit of the state's attorney discloses that any person or party to be served with the summons is out of the state, on inquiry cannot be found, is concealed within the state, resides out of the state, whose mail at the last known address has been returned, whose location is unknown or is affected by the designation "All Whom It May Concern," the court shall cause the summons, modified to declare the initials of the child in lieu of the name of the child, to be published once in a newspaper of general circulation published in the county where the action is pending or in a newspaper in another county designated by the court as most likely to give notice to the party to be served. Publication of the summons shall be made not less than five days before the date of the hearing on the petition. Notice given by the publication is the only required notice to the concerned persons or parties to be served who are described in this section. An affidavit or certificate of publication made by the concerned newspaper and accepted by the court is evidence of service of summons by publication.

If service of the summons by publication is authorized, the party making service may at his option, without any order of the court, personally serve the summons on any person or party out of the state or the party may admit service of the summons, and no publication of the summons for that party is necessary.